1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
DAVID P. DONOVAN,              .    Civil Action No. 1:20cv1344
                               .
              Plaintiff,       .
                               .
     vs.                       .    Alexandria, Virginia
                               .    January 8, 2021
BETH WILKINSON,                .    3:12 p.m.
                               .
              Defendant.       .    (OPEN PROCEEDINGS)
                               .
.   .   .   .   .   .   .   .   .
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE IVAN D. DAVIS
UNITED STATES MAGISTRATE JUDGE
(Via ZoomGov)

<u>APPEARANCES</u>:

```
FOR THE PLAINTIFF:          CATHY A. HINGER, ESQ.
                            LELA M. AMES, ESQ.
                            CLAIRE J. RAUSCHER, ESQ.
                            Womble Bond Dickinson (US) LLP
                            1200 19th Street, N.W., Suite 500
                            Washington, D.C. 20036-2421


FOR THE DEFENDANT:          THOMAS G. CONNOLLY, ESQ.
                            THOMAS B. MASON, ESQ.
                            JARED P. MARX, ESQ.
                            Harris Wiltshire & Grannis LLP
                            1919 M Street, N.W., 8th Floor
                            Washington, D.C. 20036


FOR INTERVENOR,             CHRISTINA G. SARCHIO, ESQ.
   PRO-FOOTBALL, INC.:      AMISHA R. PATEL, ESQ.
                            Dechert, LLC
                            1900 K Street, N.W.
                            Washington, D.C. 20006
```

(Pages 1 - 35)

(Proceedings recorded by FTR electronic sound recording,
 transcript produced by computerized transcription.)

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR INTERVENOR,              NEIL A. STEINER, ESQ.
        PRO-FOOTBALL, INC.:       Dechert, LLC
 3                                Three Bryant Park
                                  1095 Avenue of the Americas
 4                                New York, NY 10036-6797
                                     and
 5                                THEODORE E. YALE, ESQ.
                                  Dechert, LLC
 6                                Cira Centre
                                  2929 Arch Street
 7                                Philadelphia, PA 19104-2808

 8
     FOR THE WASHINGTON POST:     LAURA R. HANDMAN, ESQ.
 9                                PATRICK J.  CURRAN, JR., ESQ.
                                  Davis Wright Tremaine LLP
10                                1301 K Street, N.W.
                                  Suite 500 East
11                                Washington, D.C. 20005
                                     and
12                                ADAM I. RICH, ESQ.
                                  Davis Wright Tremaine LLP
13                                1251 Avenue of the Americas
                                  21st Floor
14                                New York, NY 10020-1104

15
     ALSO PRESENT:                KALEA CLARK, ESQ.
16                                KOSTA STOJILKOVIC, ESQ.

17
     TRANSCRIBER:                 ANNELIESE J. THOMSON, RDR, CRR
18                                U.S. District Court, Third Floor
                                  401 Courthouse Square
19                                Alexandria, VA 22314
                                  (703)299-8595
20

21

22

23

24

25
```

3

1                    P R O C E E D I N G S

2           THE CLERK:  All right, the Court calls Civil Action

3    No. 20cv1344, Donovan versus Wilkinson.  May we have

4    appearances of counsel, please, starting with the plaintiff.

5           MS. HINGER:  Good afternoon, Your Honor.  Cathy

6    Hinger appearing for plaintiff, David Donovan.  I'm joined by

7    my cocounsel, Claire Rauscher, who you see on the video, as

8    well as Lela Ames, who is also on the Zoom line today.

9           THE COURT:  Good afternoon.

10          MR. CONNOLLY:  Your Honor, good afternoon.  This is

11   Tom Connolly, with the law firm of Harris Wiltshire & Grannis.

12   Along with me today is my partner Tom Mason and my partner

13   Jared Marx, and also with us is Kosta Stojilkovic, who is at

14   the Wilkinson law firm, and he's been acting as an internal

15   counsel for us.

16          THE COURT:  Good afternoon.

17          Now, this is my understanding of what's occurring

18   today:  There's been a motion filed by the intervenor, the PFI,

19   for the Court to seal, strike, and reconsider, and I believe

20   that's to seal, strike, and reconsider previous determinations

21   about redactions, was that in the November 25 order?

22          MR. CONNOLLY:  That is correct, Your Honor.

23          THE COURT:  And there was a motion filed, a consent

24   motion to file to close that hearing.  Then *The Washington Post*

25   filed -- well, they had filed a motion to intervene in that

4

1    hearing as well, which is set to be heard on January 29.

2            In the interim, they filed a second motion to

3    intervene, which this Court essentially has interpreted as a

4    motion to -- for the Court to reconsider a motion to intervene

5    for the limited purpose of the Court to reconsider its

6    determination to close the hearing on the motion to seal,

7    strike, and reconsider.

8            Is that everybody's understanding?

9            MS. SARCHIO:  Yes, Your Honor.

10           MR. CONNOLLY:  Yes, Your Honor.

11           MS. HINGER:  Yes, Your Honor.

12           MS. SARCHIO:  Yes, Your Honor.  And good afternoon,

13   Your Honor.  This is Christina Sarchio on behalf of intervenor

14   Pro-Football, Inc., also doing business as the Washington

15   Football Team.

16           THE COURT:  All right.

17           MS. SARCHIO:  And with me today I have -- sorry.  I

18   have Theodore Yale, Neil Steiner, and Amisha Patel with Dechert

19   on Zoom also.  Thank you, Your Honor.

20           THE COURT:  Okay.  Well, the Court has had an

21   opportunity to review *The Post*'s motion to -- second motion to

22   intervene and all other filings filed either in opposition or

23   in reply, all filings concerning that motion.

24           Now, so let's begin.  Why, why did you -- anything

25   you'd like to add?

5

1              MS. HANDMAN:  Yes, Your Honor.

2              MR. CURRAN:  Yes, Your Honor.  This is Pat Curran

3    from Davis Wright Tremaine for *The Washington Post*, and my

4    colleague, Laura Handman here, will be handling oral argument

5    on behalf of *The Post*.

6              THE COURT:  All right.

7              MS. HANDMAN:  Hi, Your Honor, and good afternoon.

8    And on the phone call is my colleague, Adam Rich from Davis

9    Wright, as well as Kalea Clark, deputy general counsel of *The

10   Washington Post*.

11             THE COURT:  The public access line.

12             MS. HANDMAN:  Yes, um-hum.  And thank you, Your

13   Honor, for this opportunity, and you stated it correctly.  As

14   you know, there was a motion to close this hearing on Christmas

15   Eve.  Your Honor issued the proposed order.  We weren't

16   consulted.  We were only at that point proposed intervenors,

17   and Your Honor issued the order -- the proposed order closing

18   the entire hearing for today on the 28th, and on the 29th, we

19   filed a second motion to intervene and also motion to expedite,

20   and as Your Honor points out, we did file a reply yesterday to

21   the opposition that was filed on Wednesday.

22             I -- it's been a long day for you, and I will try and

23   be as brief as possible.  The main point and why we think the

24   Court may want to reconsider is that the Court, to the best of

25   our knowledge, was not made aware of the filings on

1    December 21, 22, and 23 in the Maryland federal litigation

2    between the minority Team -- shareholders of the Team and

3    Mr. Snyder, the majority shareholder of the Team, and those

4    filings disclosed and discussed the 2009 settlement agreement

5    that we don't know for sure but we have reason to believe is at

6    the heart of this injunction proceeding, and I would ask that

7    because of these just recent filings, of course, when Your

8    Honor issued his opinion on November 25 setting forth what

9    should be redacted about a settlement, etc., these disclosures

10   were not in the public record.

11          And if I -- and even though they were filed just the

12   week before and even though the Team's counsel in that -- in

13   the Maryland case is also the Team -- Mr. Snyder's counsel in

14   the Maryland case and the Team's counsel here, they did not

15   bring those filings to your attention in their motion to close.

16          We think that they vary significantly on this, and if

17   I might just quickly review what is the Maryland case and what

18   those filings are, it's a fight between the majority and the

19   minority owners about the sale of shares, but as -- it's

20   devolved into a fight over Mr. Snyder claims the minority

21   shareholders are smearing him.  They claim he's leaking to the

22   press.

23          There was a public hearing yesterday conducted by the

24   judge.  I think the judge said this had become a scorched earth

25   case and --

7

1          THE COURT:  Let me stop you there, Ms. Handman.

2          MS. HANDMAN:  Sure.

3          THE COURT:  I don't really care about those cases.

4   All I care about is revolving around those cases is what

5   information do you believe were -- or was disclosed in that

6   process that are the subject of redaction or sealing motions in

7   this case that you believe they've waived the right to seal

8   because they're already in the public domain?

9          MS. HANDMAN:  First of all, the most significant one,

10  I would say, is Mr. Snyder's declaration that he put in on

11  December 23, which the Court said he insisted would not be

12  redacted, and he filed it in the public record.  It was in

13  response to the minority shareholders claiming that he had

14  leaked to *The New York Times*, which published a story

15  December 19 which detailed allegations about sexual misconduct

16  that had been made against Mr. Snyder that -- on a flight from

17  Las Vegas to D.C., and that -- the article said that there had

18  been an in-house investigation and outside counsel

19  investigation and that those allegations had not -- did not

20  substantiate it, and the woman who made the allegations was

21  fired for lying to the lawyers and -- but to avoid publicity --

22  bad publicity, they entered into a financial settlement and a

23  nondisclosure agreement.

24          So Mr. Snyder -- and routine -- this minority

25  shareholder said that that was so much from Mr. Snyder's

1    perspective that it suggested that he was the one that leaked

2    that.  He replied on the next day, saying he didn't leak to *The*

3    *Times,* and he attached *The Times* article to his papers.

4            Then the next day, the 23rd, he filed the

5    supplemental declaration that he insisted be not redacted that

6    said that the allegations were meritless -- these are his words

7    under oath, that they, they -- there was no evidence of

8    wrongdoing found after an investigation by a well-respected

9    firm, and that the insurance carrier had decided to settle, and

10   he attached to his declaration an article by *The Washington*

11   *Post* on December 22 that reported on a settlement agreement of

12   $1.6 million for sexual misconduct allegations along the lines

13   of what *The Times* said.

14           That had five signatories.  One of them was

15   Mr. Donovan, who had conducted the internal investigation,

16   another one Mr. Snyder's lawyer, a third was Brendan Sullivan,

17   representing the alleged victim, and that while it wasn't

18   clear, the article said whether that is the settlement at issue

19   in this injunction, they noted -- the article noted that

20   Mr. Sullivan had put in a sealed affidavit in support of

21   Ms. Wilkinson in this case.

22           And this -- these disclosures, in our mind, change

23   the landscape significantly with regard to confidential

24   information relating to the settlement agreement and the

25   investigations, and I cite seven reasons.  One is the one Your

1    Honor made, which is it's now public, and the court in the

2    Fourth Circuit in the *Knight Publishing* said if the public is

3    already aware of it, that is something the court must consider,

4    and indeed, in the *Lifenet* case, which both the Team and

5    Mr. Donovan rely on, there, where -- it involved trade secrets,

6    but where some of the trade secrets have been published in an

7    article, the court said there couldn't be sealing.  So that's

8    number one.

9          Number two, this doesn't involve trade secrets.  This

10   is basically reputational harm that's being alleged, and again,

11   the Fourth Circuit in the *Doe* says said that's day-to-day

12   things that happen in the court and that's not a basis just for

13   sealing.

14         And I think the third thing here is that public

15   interest is so compelling.  This is not just a private

16   commercial transaction.  This involved allegations of systemic

17   harassment at the highest levels of the national prominent

18   leading football team, beloved by many in our, in our world

19   here in D.C., Virginia, and Maryland.

20         And you know *The Washington Post* has written some

21   very strong stories detailing tens of -- you know, many, many

22   women making allegations of harassment, and that's something

23   that the public has an interest in knowing in this proceeding

24   in connection with that.

25         Now, there is a nondisclosure agreement, and that is

1    something that obviously the Court has to give some weight to,

2    and I understand as a litigator myself that, you know,

3    oftentimes clients want nondisclosure agreements, and that is

4    just in settlement.  But here, first of all, it's not

5    dispositive, the Court is not bound by it, and the cases have

6    made that clear, and we've cited a number of cases that involve

7    similar kinds of confidentiality agreements.

8            And more importantly, as Your Honor pointed out,

9    Mr. Donovan chose to bring this lawsuit, and when he did, that

10   necessarily triggered the rights of the public to know why is

11   he invoking the injunctive authority of this Court?  What is --

12   which is a very significant thing.

13           And on that -- yes?  Sorry.

14           THE COURT:  Focus.  This is all about why or why not

15   the hearing on the motion to seal, strike, and reconsider

16   should be open for the public.  This is not about the public's

17   complete right of access, because the Court -- even if the

18   hearing is closed and the Court determines during the hearing

19   that 95 percent of the information was not sealable, it can be

20   made available to the public, and the public exercises its

21   right to access.

22           The only real question is why does the hearing not

23   need or should not be closed, with the possibility of

24   inadvertent readings and the difficulty of clawing back that

25   information once released if the Court does at some point

1    determine that that information should have been sealed?

2              MS. HANDMAN:  Your Honor, I -- on that point, we cite

3    a number of cases where hearings on sealing are not closed,

4    including one in front of Your Honor, *White v.* --

5              THE COURT:  That -- we're talking about this

6    particular case.  Each case is different.

7              MS. HANDMAN:  Well, Your Honor, what we would argue

8    and what we argue in our papers is we understand that there

9    will be portions of the hearing where, for example,

10   attorney-client privilege may be discussed, and to the extent

11   that attorney-client privilege is not out there now already in

12   public by virtue of some of these disclosures about the

13   investigations, etc., those should be, you know -- we will get

14   off the Zoom call, and those can be closed, and -- but to the

15   extent it's discussing, for example, you know, what is the

16   focus of this injunction, what was it, was it about --

17             THE COURT:  We're not --

18             MS. HANDMAN:  -- disputed agreements --

19             THE COURT:  Ms. Handman, we're not here to discuss

20   any of that.  We're hear to discuss the sealing of documents.

21   This case, a voluntary dismissal has been filed in this case.

22   This case is over almost.

23             We're here to resolve motions that have been filed

24   pre-filing of the dismissal request.  That's it.  We're not

25   going into the substance of this case.  We're here to determine

1    whether or not information that's currently under seal or that

2    has been redacted should remain so, period.

3            MS. HANDMAN:  Well, as I -- I understand, Your Honor,

4    but I think what we're saying is portions of that hearing

5    should be open where there is no longer a need for sealing or

6    secrecy and don't have to be closed.

7            And I understand Your Honor has ordered the

8    transcript.  It obviously needs to be filed expeditiously, and

9    we would urge that any redactions be very, very narrow, related

10   just to privileged information that has not been put on the

11   public record, but the Fourth Circuit again said that the

12   public and the press have a right to contemporaneous access to

13   see if there's documents and proceedings, and that's what this

14   states here.

15           So there has to be a very compelling interest to

16   close the doors -- or the Zoom doors, as we would say -- to a

17   hearing where things other than attorney-client privilege are

18   going to be discussed, and that's the premise that we've

19   offered.

20           And we would urge the Court when you do go into the

21   session, that you keep in -- you know, consider all the public

22   disclosure that has occurred regarding the 2009 agreement,

23   assuming it is the same agreement that was discussed in the

24   Maryland litigation.

25           THE COURT:  Thank you.

1           Opposition?

2           MS. SARCHIO:  Your Honor, thank you, Your Honor.

3   Christina Sarchio on behalf of the intervenor, the Team,

4   opposing *The Washington Post*'s motion.  Your Honor correctly

5   decided to close today's hearing based on intervenor's motion

6   that was founded on well-reasoned law and the facts, the unique

7   facts of this case.  The Court weighed the great concerns of

8   the likelihood of inadvertent disclosure of privileged and

9   confidential information against the public's right of access.

10  The Court thoughtfully determined that closing the hearing to

11  the public --

12          THE COURT:  (Inaudible) at that time that there was

13  the possibility that much of this information had already been

14  released to the public.

15          MS. SARCHIO:  Your Honor, that is not true at all.  I

16  am counsel in both cases, Your Honor.  First, the Maryland

17  case --

18          THE COURT:  (Inaudible) on the accuracy or inaccuracy

19  of that statement.

20          MS. SARCHIO:  Yes, Your Honor, thank you.

21          THE COURT:  Because the law gives this Court an

22  absolute inherent right to change its mind.

23          MS. SARCHIO:  Absolutely, Your Honor.

24          Your Honor, the case in Maryland did not involve any

25  of the same parties here.  That is a business dispute amongst

14

1    business partners.  None of the parties here, neither the Team

2    nor plaintiff nor defendant, are parties in that litigation.

3            THE COURT:  It's not relevant.

4            MS. SARCHIO:  Your Honor --

5            THE COURT:  (Inaudible) has it been released

6    publicly, period.

7            MS. SARCHIO:  No, Your Honor.  None of the documents

8    at issue in this case have been filed in that case, either

9    publicly or under seal, Your Honor.  I can make that

10   representation to the Court.  What was filed was a news article

11   that made a number of references to leaks, and the court in

12   that case in Maryland held a hearing on the leaks of

13   confidential business information.

14           We did have a hearing yesterday on this where the

15   court interviewed people and held an evidentiary hearing, Your

16   Honor, and found that there were -- there was no evidence of,

17   of leaks from any of the parties in that litigation.  There was

18   a passing reference, Your Honor, in that case to the 2009

19   settlement agreement that appeared in a newspaper article that

20   the parties responded to as part of the broader response, but

21   there was nothing that was filed in that case that is at issue

22   in this case.

23           The Team has not waived privilege with regard to any

24   of the documents at issue in this case, and today's hearing,

25   Your Honor, is about privilege generally, the Team's privilege

15

1    generally, we'd like to talk about what -- the assortment of

2    documents that have been filed.  It's not about one document.

3    It's about an assortment of documents that have been filed in

4    this case, what's privilege, what's not privilege, why we're

5    asserting privilege, what we think should be confidential, so

6    the hearing is much broader --

7         THE COURT:  How do we not make that argument without

8    referring to the specifics of the documents?  And I'm saying

9    that because the last hearing, out of an abundance of caution

10   that the Court, you know, at some point in time closed and then

11   found itself faced with an inaccurate representation of why it

12   was closed in further filings from the parties, the first half

13   of that hearing didn't even though the parties wanted it

14   closed, didn't discuss any privilege or information that the

15   Court deemed sealable or redactable.

16        The parties made a comment, and the Court said, okay,

17   out of an abundance of caution, it would be based on what the

18   Court understood then what the logistics of closing the public

19   access line and how that would work and things, that out of an

20   abundance of caution, we'll close the remainder of the hearing.

21        In the remainder of that hearing, which was

22   approximately 30 minutes, at the conclusion of that 30 minutes,

23   the Court concluded that probably about 45 seconds of that 30

24   minutes was probably redactable.  Not a reason to seal or close

25   the 30 minutes of that part of the hearing, either.  So the

16

1    parties obviously made their arguments without specifically

2    referring to specific factual information concerning the

3    allegations in question, and they made their points well enough

4    for the Court to make a ruling.

5            Why is this any different?

6            MS. SARCHIO:  Your Honor -- and I, I read the

7    transcript of that hearing, and I, and I noted Your Honor's

8    comment at the end, there was very little that was indeed

9    redacted, but the risk that there was -- there was an

10   inadvertent disclosure.  The risk that there would be even more

11   inadvertent disclosures could be cured by sealing the record at

12   the time, the hearing at the time, and then making the

13   transcript available.

14           That strikes the right balance, Your Honor, between

15   making sure that the parties are able to engage in a meaningful

16   discussion with the Court about what's privilege, what's not

17   privilege, without risking somebody saying something

18   inadvertently and then having to -- either the cat's out of the

19   bag or, or then having to shut down the proceeding so that --

20           THE COURT:  Well --

21           MS. SARCHIO:  -- we could go and close the hearing,

22   and so by doing it this way --

23           THE COURT:  We denied the public right of access

24   because attorneys may be negligent.  That's, that's your

25   argument.

17

1      MS. SARCHIO:  No, Your Honor.  We --

2      THE COURT:  (Inaudible) who have filed the motion,

3  the opposition for the later motions and replies, who are

4  prepared for that hearing, are somehow going to inadvertently

5  let information spill out after over a week of preparation for

6  the hearing, and the public should sacrifice based upon that

7  because lawyers can't seem to not disclose information that

8  they know they're not supposed to disclose.

9      Kind of like a trial, when you put a witness on the

10  stand, and people say, well, without referring to the

11  information that was told to you because it's hearsay, can you

12  say why you did with that or why -- based on the information

13  provided to me, I decided to investigate further, without

14  disclosing the information?

15      We're not capable of doing that?

16      MS. SARCHIO:  Your Honor, this Court -- both Judge

17  Trenga and this Court have already sealed proceedings in this

18  case, have already found that there is confidential information

19  that's at issue.

20      THE COURT:  (Inaudible) seal with regard to Judge

21  Trenga is completely inappropriate because that was a hearing

22  concerning a preliminary injunction, which is case dispositive.

23  It's a completely different standard then.

24      MS. SARCHIO:  Well, Your Honor, the Court -- Judge

25  Trenga did determine that there was information that is

18

1    confidential that needed to be redacted and then referred the

2    matter to Your Honor.

3              THE COURT:  No, he didn't redact it.

4              MS. SARCHIO:  The Court --

5              THE COURT:  Ms. Sarchio, let's be accurate when we're

6    discussing Judge Trenga's statements.  He said:  There may be

7    information that maybe shouldn't be in the public venue.  I

8    can't make that determination, essentially just paraphrasing,

9    at this juncture, and you're going to be filing stuff, and I

10   can't make that decision, and so if any of the issues come up,

11   talk to Judge Davis.

12             That's basically what Judge Trenga said.  He didn't

13   make any decision that obviously, oh, because of whatever

14   occurred in previous hearings, this information is definitely

15   redactable or sealable, and we should just in order to avoid

16   this information getting into public view that could seriously

17   harm one party or the other, that I'm sealing this hearing.  He

18   made no such statement.

19             MS. SARCHIO:  Well -- correct --

20             THE COURT:  All he said is:  I'm sealing this because

21   there may, and if you want to discuss that issue with a lot of

22   other filings you'll probably be filing in this case later on,

23   take those issues up with Judge Davis.

24             MS. SARCHIO:  Right, but there was a recognition,

25   Your Honor, that this is a unique case.  As Your Honor pointed

19

1   out earlier, these cases need to be decided whether to close

2   them to the public or not on a case-by-case basis.  This is a

3   case that involves a dispute among lawyers about their

4   respective legal work, and it does involve privileged and

5   confidential information.  Your Honor has already decided that

6   some things need to be redacted, that the attorney-client

7   privilege applies.

8           So going back to your question, it's not about

9   inadvertent disclosure that people make to work things out.  If

10  you want to have a discussion --

11          THE COURT:  Ms. Sarchio, when the Court speaks, you

12  don't.

13          MS. SARCHIO:  I'm sorry to interrupt, Your Honor.

14          THE COURT:  Redact any attorney-client privilege

15  information.  I didn't say it necessarily applies.  I'm saying

16  if it applies, that's something that probably will be redacted

17  and sealed.  That's what I said.

18          This case is not any more unique than any others.

19  There have been motions filed, but this case, which, by the

20  way, Judge Trenga unsealed, is about accusations, yes,

21  attorneys against attorneys, and whether they performed their

22  job well or whether they did some bad things.

23          None of that -- making those arguments don't

24  necessarily require parties to divulge confidential

25  information, commercially, proprietary, sensitive information,

20

1    or attorney-client confidential communications.  You made that

2    argument in the first couple of paragraphs of the complaint.

3            The plaintiff said she did -- she probably willfully

4    did this, and it's harming my reputation, and none of that

5    involved confidential communication.  None of that involved

6    what would have been information redacted.

7            So the arguments can be made.  This case is no more

8    significant than any other case this Court has to rule on when

9    it comes to redacting information because the standard for

10   redacting and sealing remains the same in every case.

11           MS. SARCHIO:  Yes, Your Honor.  I wanted to make two

12   points.  One, just going back to the court in Maryland, just to

13   note for the record that in that case, which involves just a

14   business dispute, the court held a number of hearings under

15   seal closed to the public.  Even though it had granted *The*

16   *Washington Post*'s motion to intervene, it still excluded *The*

17   *Post* and, and the public from a number of hearings.  Yesterday

18   was the first time that the court openly held its hearing and

19   did that with a specific intent.

20           THE COURT:  Well --

21           MS. SARCHIO:  Your Honor --

22           THE COURT:  -- (inaudible) if you go back in front of

23   that court again.

24           MS. SARCHIO:  I'm sorry, Your Honor?

25           THE COURT:  And if I were that court, your point

1    would be made, but I'm not.

2              MS. SARCHIO:  Yes, Your Honor.

3              The only reason the intervenor has, has moved in this

4    court, Your Honor, is to assert privilege, to be able to have a

5    meaningful and frank and open discussion about its privilege,

6    assertion of privilege and privacy and confidentiality over

7    documents that have been filed in this case, frankly, without

8    its consent.

9              In order to have a meaningful discussion, Your Honor,

10   and not a theoretical discussion, then it needs to be closed so

11   that we could, we could have again a more meaningful and honest

12   discussion with the Court about why we think certain things

13   should be privileged and should be -- or are privileged, should

14   be kept under seal, and what other things we think should be

15   under seal for other reasons.

16             I'd like to point to the -- a case that we cited in

17   our briefs, Your Honor, the *Copley* case in the Ninth Circuit,

18   which I appreciate is in a different jurisdiction, but there's

19   just not a lot of body of case law on closing hearings on

20   motions to seal, but in that case, the Ninth Circuit felt that

21   the district court's decision to close the hearing on a motion

22   to seal was sensible because that way the court could hear the

23   private explanation of why the case should be sealed, which

24   will contain not only the facts that the parties hope to keep

25   secret but the reasons for keeping those facts under seal, and

1    so that's what we're hoping to do here, Your Honor, is again

2    having a meaningful discussion.

3           There is no right of access, the public's right of

4    access to a motion such as this, which is a non-dispositive

5    motion on a civil issue, and the Court has carefully balanced

6    our interests in being able to have an open and frank

7    discussion, the risk of inadvertent disclosure with the

8    public's right of access, and it found that the proper balance

9    is by closing the hearing and then making the transcript

10   available to the public once the opportunity to, to review to

11   see if there are any redactions that are necessary or apply.

12          That's, that's a sensible approach, Your Honor.  Your

13   Honor has already reached that decision.  *The Post* hasn't

14   provided any compelling reason why the Court should reconsider

15   that decision, and so we respectfully request that the Court

16   deny *The Post*'s motion.

17          THE COURT:  So why did we begin our argument with

18   avoiding inadvertent disclosure if you ended your argument with

19   in order to have a frank discussion, we have to divulge

20   essentially this confidential information?  It's one or the

21   other.  Is the divulging of information, your concern about it

22   being inadvertent, or do you intend to divulge what you believe

23   is sensitive, confidential information and/or attorney-client

24   privilege information, and is your intent to do that during the

25   hearing on the motion to seal, strike, and reconsider?

1          MS. SARCHIO:  Your Honor, everything that intervenor

2     has filed with the Court, we have been very careful to make

3     things as public as possible, and if you look at our filings,

4     Your Honor will see that.  We -- our goal is not to have more

5     things to have to file under seal.  Our goal is to file as much

6     as we can in the public record, hoping that the information and

7     the arguments, the legal arguments speak for themselves,

8     without necessarily going into the facts and details of it.

9          I just don't know, Your Honor, I would like to have

10    an open and frank discussion.  There is a great risk of

11    inadvertent disclosure.  I think it's, it's both, Your Honor.

12    It's both arguments.

13         THE COURT:  The Court ruled on these motions without

14    divulging confidential information.

15         MS. SARCHIO:  I'm so sorry, Your Honor, I didn't hear

16    the Court.

17         THE COURT:  I'm confused on why we feel a need to

18    close a hearing to the public because the attorneys don't know

19    whether or not they are capable of keeping their client's

20    confidential information confidential and not inadvertently

21    disclosing it.  I mean, that's what we're paid to do.

22         MS. SARCHIO:  My intent, Your Honor, at a hearing is

23    to be able to get into some details and make some factual

24    assertions, Your Honor, that I expect you'd be -- that are

25    privileged, that would remain as privileged and would remain

1   sealed, but even, even without that, Your Honor, if we had this

2   hearing in public, there's just a great risk that somebody is

3   going to say something inadvertently, even if -- despite the

4   best intentions, and we already had that happen once before in

5   this case, and so given that the, that the public does not have

6   an automatic right to access these kinds of hearings on motions

7   to seal, the right balance is to then seal it, permit the

8   parties to engage in a dialogue with the Court about privileged

9   issues, and then to go back, and ideally if it's only a few

10  minutes of the hearing that gets redacted, even better for the

11  public, but if the Court has very specific questions -- and,

12  Your Honor, I've been listening to Your Honor all day today.

13  You're very specific.  You get into the details, and in order

14  for us to be able to meaningfully respond to some of your

15  questions, I don't know how we can try to dance around

16  privileged discussions.

17          THE COURT:  Now, you made -- well, she made a

18  comment, you made a comment saying Ms. Handman's

19  representations essentially were inaccurate concerning

20  information that we're talking about here, confidential,

21  possibly privileged information that was released in the

22  Maryland case.

23          You said that was not the case, that both were

24  generic statements.  She made a specific reference to a

25  declaration submitted by, let's just say, Team owner that seem

1    to talk about the allegations supporting the agreement that we

2    have been not trying to discuss.

3           What was she referencing -- she referenced

4    specifically a declaration that -- and the information that

5    came or flowed from that appears to be information that the

6    Court has tried to inform the parties should be redacted from

7    previous motions to seal, which would specifically be

8    information revolving or involving this case.

9           MS. SARCHIO:  So three points in response, Your

10   Honor.  First, Mr. Snyder is not a party to this.  This is the

11   Team asserting its privilege.  That's the first point.

12          Second point, Your Honor, is that the discussion that

13   we are hoping to have today is about the Team's broad

14   assertions of privilege, not about any one specific document or

15   a specific reference.  So it's, it's a broader discussion that

16   we're hoping to have with the Court today.

17          And three, again, you'd have to look at those

18   declarations filed in Maryland.  Mr. Snyder was responding to a

19   declaration and an exhibit that was submitted in the action

20   regarding leaks to *The New York Times* and various newspapers

21   about certain issues, including the business deal, including a

22   confidential settlement agreement and other things, Your Honor,

23   and he was responding to those assertions in the declaration.

24          No documents were attached other than a public

25   filing, *The Washington Post* article, but there was no

1   confidential information filed in that case again either

2   publicly or under seal that are at issue in this case.  And so

3   we are somewhat talking about apples and oranges, Your Honor,

4   in terms of what, what those allegations are in those cases

5   versus what the allegations and the, and the parties are in

6   this case.  And so it's not -- they're not the same thing, Your

7   Honor.

8           And, and again, that case and that judge was looking

9   into leaks, not the voluntary waiver of privileged information,

10  and it was in response to allegations and was citing to things

11  that were already in the press, Your Honor.

12          MS. HANDMAN:  Your Honor, if I might -- and you're

13  exactly right.  I mean, we attached the declarations that were

14  filed, and Mr. Snyder is not just some random guy.  He's not

15  only the majority owner of the Team; he was an accused person,

16  person accused of the sexual harassment.  He was a party to the

17  settlement agreement.  He was the subject of the internal

18  investigations.

19          And he wrote in his declarations, sworn declarations

20  filed in public at his request, he said the underlying

21  allegations were meritless, quote, that, quote, no evidence of

22  wrongdoing was found after an investigation by a well-respected

23  law firm, closed quote, and that the insurance carrier decided

24  to settle notwithstanding the absence of wrongdoing.

25          That's what he wrote in his declaration, and he

27

1    attached *The Washington Post* article, and in the prior filing,

2    he attached *The New York Times* article, but that's what he said

3    in his own words in his declaration.

4              THE COURT:  Well, I'm going to --

5              MS. SARCHIO:  Your Honor --

6              MS. HANDMAN:  And I would (inaudible).

7              THE COURT:  Ms. Handman.

8              MS. HANDMAN:  Yes.

9              THE COURT:  The court reporter can only take down one

10   person at a time.

11             MS. SARCHIO:  Thank you, Your Honor.

12             MS. HANDMAN:  Okay.

13             MS. SARCHIO:  With respect, I would ask Ms. Handman

14   to read the entire --

15             THE COURT:  Ms. Handman, let Ms. Sarchio speak,

16   please.

17             MS. SARCHIO:  I would ask Ms. Handman to read the

18   entire quote because Mr. Snyder isn't just saying that in a

19   vacuum.  He is responding to an assertion made by another party

20   in that case against him.

21             THE COURT:  What difference does it make how he

22   places the information in the public forum, whether it's his

23   own doing or he's responding?  Placing it in the public forum

24   is placing it in the public forum, which means why should it be

25   taken back out?  The public already has access to it.

1           If he has inadvertently placed it in the public

2    forum, that's one thing, because then you don't want to

3    compound an already made mistake, but he didn't.  You

4    specifically said he's responding, which means he intentionally

5    placed that information in the public forum, the exact thing --

6    part of which is the exact same information that the parties

7    are talking about to be redacted here.

8           MS. SARCHIO:  Again, Your Honor, respectfully, the

9    Team, and not Mr. Snyder, have intervened here to assert a

10   broader privilege.  We're not talking about just one document

11   here.  We're talking about an assertion of privilege over a

12   number of documents that have been filed in this case under

13   seal that are -- that the Court is considering.

14          And so there's more, there's more than just that one

15   assertion of one document.  It's the Team that's asserting the

16   privilege here, Your Honor, not anyone else, not any principals

17   that are, that are asserting the privilege in this case.

18          And again, that case involves a business dispute.

19   That is just -- that's, that's just --

20          THE COURT:  I really don't care what it involves.

21   All I care about, what information is or is not in the public

22   forum and how it got there and is it the same information that

23   the parties are trying to keep out of the public forum in this

24   motion.  That's all I care about.

25          MS. HANDMAN:  Your Honor, I'm happy to read the two

1    paragraphs from Mr. Snyder --

2            THE COURT:  Ms. Handman --

3            MS. HANDMAN:  Sorry?

4            THE COURT:  Be quite specific.  Unless you can

5    reference it differently, Ms. Sarchio said that that was one

6    piece of information.  During this hearing, they intend to

7    discuss a lot of other what she considers confidential,

8    privileged, private information.

9            So what, we want to publish right of access to -- and

10   the possibility of inadvertent disclosure in having to deal

11   with the logistics for 5 percent of the 100 percent of

12   information that's going to be discussed?

13           MS. HANDMAN:  Your Honor, obviously, I don't -- I'm

14   not privy to the documents, so I can't weigh in on how much

15   would be involved or not.  What I do know is that to the extent

16   that there's discussion of the investigations that were done in

17   connection with the settlement agreement, with -- in connection

18   with the amount of the settlement with the --

19           THE COURT:  The information that has been disclosed

20   is the information you said that was placed in this

21   declaration.

22           MS. HANDMAN:  Right.

23           THE COURT:  So the Court has an absolute right to

24   say, well, now that that's in the public view, the public has

25   access to it now.  So giving them access to the hearing doesn't

1    change that.  They already have access to it if it's in the

2    public forum.  Why do they need access to the hearing to get

3    exactly the same information they already have access to?

4              MS. HANDMAN:  Your Honor, I presume that the hearing

5    would confirm that this is indeed the same settlement agreement

6    that was the focus of this --

7              THE COURT:  It's not the purpose of this hearing to

8    confirm or deny something that *The Washington Post* can report

9    in an article.

10             MS. HANDMAN:  So I think that would be incidental to

11   it --

12             THE COURT:  You have the declaration in front of you.

13             MS. HANDMAN:  I do.

14             THE COURT:  If it was made public, then it's public.

15             MS. HANDMAN:  That's correct.

16             THE COURT:  You don't need to make it public a second

17   time in a hearing that will be taking place after this one.

18   It's already --

19             MS. HANDMAN:  Well --

20             THE COURT:  -- (inaudible) access.

21             MS. HANDMAN:  I mean, for example, *The Post* story

22   gives great detail about the settlement agreement, but they --

23             THE COURT:  (Inaudible) on whether the public has

24   access to it already, so why do they need access to this

25   hearing?

31

1              MS. HANDMAN:  Well, for example, as, as the article

2    says, we don't know for a fact that this is the same --

3              THE COURT:  And if the information is confidential

4    and the Court deems it redactable and sealable, you don't have

5    the right to have access to it, but that doesn't prevent a

6    frank discussion.

7              But if the Court deems during a hearing that the

8    public has a right to it and they don't have the right to

9    redact it, the public will get access to it, but --

10             MS. HANDMAN:  Your Honor, as you know --

11             THE COURT:  -- (inaudible) a hearing should be closed

12   or not.

13             You're mixing apples and oranges.  All we're talking

14   about is whether the hearing should be closed.  Your argument

15   is public access.  My response is the public has access to the

16   information that's already in the public forum, the public will

17   have access to the information that is divulged during the

18   hearing that the Court does not deem sealable, and the Court

19   and the public have right of access to argue its public right

20   of access before this hearing.

21             That's why when motions are made pursuant to the

22   local rules of this Court, notice must be given to the public,

23   a nonconfidential memorandum is placed out, and the public has

24   the right to be heard prior to this hearing.

25             MS. HANDMAN:  Correct, Your Honor.

1       THE COURT:  The only public the Court has heard from

2  would be you, Ms. Handman.

3       MS. HANDMAN:  I appreciate that, and I thank you very

4  much for the opportunity.  What I would say is that there's a

5  presumption of access to hearings, that it is not the -- as you

6  know, Your Honor, most hearings are open to the public.  It is

7  the extraordinary hearing that is not, and a need to close a

8  hearing and have a compelling interest --

9       THE COURT:  I don't see right now a basis to provide

10 the public access to information that they already have access

11 to, to open an entire hearing that may divulge lots of other

12 confidential information, whether any burden or not, in order

13 to acquire a succinct but broad discussion concerning whether

14 or not information should be sealed.

15       The only information I've heard that the public

16 appears to have an interest in is information that's already in

17 the public forum based upon Mr. Snyder's declaration.  So why

18 open the rest of the hearing up to something that no party has

19 argued the public has any interest in at all?

20       MS. HANDMAN:  Well, I mean, for example, Your Honor,

21 Mr. Snyder says that the allegations were meritless and that

22 they were found (inaudible).

23       THE COURT:  That's not sealable.  That wouldn't have

24 been sealable if -- that's not sealable when we have the

25 hearing.  If they're not clear about it, that's going to be

1  made clear to the parties at that hearing.  The fact that

2  Mr. Snyder said the merits are, you know -- all the allegations

3  are meritless, that's not sealable.  So the public would have

4  access to that.

5        MS. HANDMAN:  But for example, Your Honor, he also

6  says --

7        THE COURT:  Because you have the declaration, and I'm

8  sure therefore it will be placed once again in the public

9  forum.

10       MS. HANDMAN:  I'm sorry, I'm telling my husband not

11  to turn on the printer.

12       The, the -- what I was going to say, Your Honor, is

13  he also says that these investigations found no wrongdoing.

14  Now, to the extent that the documents disclose and deal with

15  that, that's something the public has a right to check is that

16  accurate.  He's made an input in the issue --

17       THE COURT:  You're wrong then, Ms. Handman.  The

18  closure of the hearing, even if the Court opens a hearing, the

19  public doesn't have a right to speak.  The public has --

20       MS. HANDMAN:  I agree.

21       THE COURT:  -- (inaudible) listen, that right of

22  access.

23       The public is not a party.  They don't have the right

24  to stand up in a motion heard, whether it's over Zoom or in

25  open court.  At 401 Courthouse Square, in a motion to seal,

34

1    strike, and reconsider, no one sitting in the audience in that

2    courthouse would have the right to stand up and say anything.

3    They would only have the right to access to the information

4    that is said, which is exactly what the Court is going to

5    provide them and has been provided them, if your argument and

6    representations are true, already.  The Court sees no further

7    reason to open the hearing.

8         The motion to intervene for the limited purpose of

9    making this argument, obviously, was granted.

10        MS. HANDMAN:  Thank you, Your Honor.

11        THE COURT:  The motion to reconsider was granted

12   because -- a portion of it because the Court has reconsidered.

13   The portion of the Court's ruling closing the hearing, which

14   essentially is asking to vacate that portion of the Court's

15   previous order, is denied.

16        Anything further in this matter?

17        MS. HANDMAN:  No, Your Honor.  I look forward to

18   seeing you January 29 on our motion to intervene -- our first

19   motion to intervene.

20        THE COURT:  Well, it would have been nice to see

21   people in person at 401 Courthouse Square, but I doubt that

22   will occur either.

23        MS. HANDMAN:  I fear you're right, Your Honor.

24        THE COURT:  You take care.

25        MS. HANDMAN:  Thank you.  We will exit from Zoom.

35

1          MR. CONNOLLY:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3                         (Which were all the proceedings

4                          had at this time.)

5

6                  CERTIFICATE OF THE TRANSCRIBER

7      I certify that the foregoing is a correct transcript from

the official electronic sound recording of the proceedings in

the above-entitled matter.

10

11                         _____
                                    /s/
12                              Anneliese J. Thomson

13

14

15

16

17

18

19

20

21

22

23

24

25