**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

David P. Donovan

              Plaintiff,

v.

Beth A. Wilkinson,

              Defendant.

Civil Action No. 1:20-cv-1344

**DECLARATION OF BETH A. WILKINSON**

I, Beth Ann Wilkinson, declare under penalty of perjury:

**<u>Background</u>**

1. I am fifty-eight years old and I have personal knowledge of the facts set forth herein.

2. I am a Founding Partner of the Washington, D.C.-based law firm Wilkinson Stekloff LLP, where I have worked since 2016.

3. I have been a member in good standing of the New York Bar since 1988 and the D.C. Bar since 1999.

4. In 1984, I received a Bachelor of Arts degree, *magna cum laude*, from Princeton University, which I had attended on a Reserve Officer Training Corps ("ROTC") scholarship.

5. In 1987, I received my Juris Doctorate degree from the University of Virginia. After graduating, I joined the United States Army's Judge Advocate Generals Corp ("JAG"). I fulfilled my four-year military obligation as counsel for Intelligence and Special

Operations to the Army General Counsel.  I had a Top Secret-SCI clearance.  During my

time in the military, I was also detailed to the Southern District of Florida as a Special

Assistant United States Attorney to assist in the prosecution of the Panamanian dictator

Manuel Noriega.

6.   Following my military service, I joined the Department of Justice as an AUSA in the

Eastern District of New York ("EDNY").  Among the cases I prosecuted in EDNY was

the successful trial of Colombian narco-terrorist Dandeny Monoz Mosquera for the

bombing of a civilian airliner and other crimes.  For my work on the *Mosquera* case, I

received the Attorney General's Exceptional Service Award.

7.   Following the *Mosquera* case, I was appointed counsel to the Deputy Attorney General

and became the Principal Deputy for Terrorism and Violent Crime.  When the Oklahoma

City bombing occurred, I was selected to join the *United States v. McVeigh & Nichols*

prosecution teams and, among other things, delivered the closing argument in the death

penalty phase of the *McVeigh* case.  For my work on the *McVeigh* and *Nichols* trials, I

received the Exceptional Service Award for a second time.

8.   In 1995, I joined Latham & Watkins as a partner, where I co-chaired the white-collar

practice group in Washington, D.C.  From 2006 to 2008, I served as executive vice

president, general counsel and corporate secretary at Fannie Mae.  I joined Paul, Weiss,

Rifkind, Wharton & Garrison as a partner in 2009 and remained there until my partners

and I founded Wilkinson Walsh LLP (now Wilkinson Stekloff LLP) in 2016.

9.   While in private practice, among other matters, I have also conducted multiple,

independent internal investigations.  I have also represented many individuals, including

Justice Kavanaugh when he was accused of sexual harassment during his confirmation

2

proceedings, and more recently, the Honorable Emmet Sullivan before the U.S. Court of Appeals for the District of Columbia Circuit in connection with Judge Sullivan's handling of the *United States v. Flynn* case.

10. I am a Fellow of the American College of Trial Lawyers, a member of the American Law Institute (ALI)), and a Legal 500 Leading Trial Lawyer. I have been named a Litigator of the Year by American Lawyer, a Law 360 Trial Ace and Trial MVP, and a National Law Journal Winning Litigator. I have also been named a National Star Trial Lawyer by Chambers and Partners.

**Initial Engagement**



11. ████████████████, I was contacted by Norman Chirite ████████████ ████████████████████████████ Before I could respond, ██ ████████████████████████████████████████ ████████████████

12. Mr. Chirite and I spoke by phone on the afternoon of ██████ On the call, he told me ██ ████████████████████████████████████ ████████████████████████████ ████████████████████████ Mr. Chirite informed me that he, ██████████████████████████ ████████████████████████████████████told me that ████████████████████████████████████ ████████████████ On the same call, ██████████ mentioned that ██ ████████████████████████████████████ ████████████████████████████ During

3

that conversation █████████████████████████████████████████

██████████████████████████

13.  On ████████, I emailed Mr. Chirite agreeing to take on the independent investigation, ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████ I also

asked ██████████████████████████████████████████████████████

████████████████████████████████

14. On J█████, ██████████emailed me ████████████████████████████

██████████████████████ The email stated:

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████████████

The email went on ████████████████████████████████████████████

15. Over the next several days, I spoke with Mr. Chirite ██████████████████████████ Mr.

Chirite stated that he did not ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ I told ████████ that we would

have to make our own assessment █████████████████████████████████

████████████████████████████████████████████

██████████████████████.

4

16. ████████, the first feature Washington Post article broke, detailing allegations of widespread sexual harassment and verbal abuse at the Team.  That article did not include ██████████████████████████████ The feature article was lengthy, over 4,000 words, and alleged sexual harassment of 15 female team employees, only of one which spoke on the record.  According to the article, the remaining 14 spoke only on condition of anonymity because of non-disclosure agreements that the Team had declined to waive. Exhibit W2.

17. Our engagement letter with the Washington Football Team was fully executed ████████ ██████████████The engagement letter was addressed to and signed by Will Rawson, General Counsel of the Team.  It directed Wilkinson Stekloff to ███████████████ █████████████████████████████████████████████████████ ██████

18. ████████ Mr. Snyder issued a public statement denouncing the conduct alleged in the article and stating, "The behavior described in yesterday's Washington Post article has no place in our franchise or society. . . .  Beth Wilkinson and her firm are empowered to do a full, unbiased investigation and make any and all requisite recommendations."  Exhibit W3.

19. The NFL also issued its own statement: "These matters as reported are serious, disturbing and contrary to the NFL's values. . . . Everyone in the NFL has the right to work in an environment free from any and all forms of harassment.  Washington has engaged outside counsel to conduct a thorough investigation into these allegations.  The club has pledged that it will give its full cooperation to the investigator and we expect the club and all

employees to do so. We will meet with the attorneys upon the conclusion of their

investigation and take any action based on the findings." Exhibit W4.

20. On Saturday ████ at 3:15 p.m. I received an email from ████████████

████████████████████████████████████████████████████████

████████████████████████████████████ I replied and told ████████████

████████████ He then wrote t████████████████████████████████

████████████████████████████

21. ████████████████ I called ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████ I spoke to ████

████████████████████████████████████████████

████████████████ I spoke to ████████████████████████████

████████████████████████████████ The entire call

lasted approximately one hour.

22. Over the course of the call, ████████████████████ described ████████

████████████████████████████████████████

████████████████████████ stated that th████████████████████

████████████████████████████████████████ stated

that ████████████████████████████████████████

████████████ asked me to ████████████████ ████████████████

████████████. I told ████████████████t ████████████ ████████

████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

23. ████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ a report prepared by Mr. Donovan, ████████████████████████████████

████████████████████████████  ██████████████████████████████

██████████████████████████████████████████████ t makes

clear that ████████████████████████████████████████ and

that the ████████████████████  ████████████████ and I spoke the next

day (████████) and the day after (████████).  I told him that ██████████████████

██████████████████████████████████████████████████████

██ In our discussions, ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

24. By ████████, our firm had begun ████████████████  We knew ██████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████  As we began contacting witnesses, it became apparent that many individuals

████████████████ cooperate in our investigation because they feared retaliation, and/or

because they were concerned that speaking to us would breach ████ confidentiality

██████████████████████████████████████████████████████

████████████████████████████████████████

7

25. As a result, my partner, Ms. Moira Penza, and I both took steps to address this issue.



Ms. Penza communicated with ████████████████████████ I contacted ████████████ and asked ████████ whether ██████ the Team would release ██ ██████████ employees, ████████████████████ from any confidentiality ████████ ██████████████████████████████████████████████ for purposes of our investigation. ████████ agreed, ████████████████ ████████████████████████████████████████████ did not compromise the independence of our work. ████████r made no mention of ████████████████████████████████ ████████████████████████████████ I took hand-written notes during my conversation ████████████████████████ I also reported my conversation ████████████ to Ms. Penza.

26. ████████ the Team announced that it would be called the "Washington Football Team" for the 2020-21 season. That day, I did speak to ████████ twice, but contrary to his assertions, ████████████ ████████████████████████████ ████████████████████████ ████████████████████████ ████████████████████ ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ If I was prohibited by ████████████████████████ from investigating ████████████, I would not have continued the representation. I also would have discussed this supposed limitation with ████████

27. Through conversations with ███████████████████████████████ was

aware that our firm was reporting regularly ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████ This was a condition imposed by ████████ that

████████ accepted from the outset. █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

28. ██████████, we executed a revised engagement letter with the Team. █████████

█████████████████████████████████████████████

█████████████████████████████

████████████████████████████████

29. On August 26, the Post published a second major article.  Exhibit W7.  The article was

█████████████████████████████████████████

30. ███████████████████ █████████████ █████████████████████████████

██████████████████████████████████████████

██████████████████████ Mr. Snyder released a statement:  "Recently, the Washington

Football Team launched an independent third party investigation into allegations about

our culture and incidents of harassment.  In conversations with Commissioner Goodell,

Tanya and I suggested that the NFL assume full oversight of the investigation so that the

results are thorough, complete and trusted by the fans, the players, our employees, and

the public.  I appreciate Commissioner Goodell agreeing to our suggestion and the entire

Washington Football Team remains committed to fully cooperating with all aspects of the investigation."  Exhibit W8.

31. Commissioner Goodell then issued a public statement concerning the matter in which he stated: "An independent investigation into these issues is in process, led by highly experienced counsel recommended by our office.  We will continue to monitor the progress of this investigation and ensure that the club and its employees satisfy their obligation to give full cooperation to the investigators. If at any time the club or anyone associated with the club fails to do so, the investigating counsel has been asked to promptly advise our office and we will take appropriate action. When the investigation concludes, we will review the findings and take any appropriate action at that time." Exhibit W9.

32. ████████████, we executed our engagement letter with ████████. ████████████ ████████████████████████████ continued after we were engaged by ████████ to send our firm documents related to specific requests made.  ████████████, we received files ████████████████████████████████████Those files included



**The Interview of** ████████████████████

33. ████████████████████ I reached out to ████████████████████ ████████████████████████████████ ████████████████████ I spoke with Mr. Sullivan by phone and asked



I explained to

34

, we informed

We also asked

Immediately following t

**Correspondence with Mr. Donovan and**

35. After speaking to                    I contacted Mr. Donovan to ask him to cooperate with our investigation and participate in an interview.  He could not speak then, and I told him I would try him again the next day.                , I spoke to Mr. Donovan twice.  During the first call, Mr. Donovan informed me

Mr. Donovan said

██████████████████████████████████ Without prompting, Mr. Donovan

then said ████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████ ████████████████████, I asked him

whether he could talk if ████████████████. He said ████████████████████

██████████████████████████████████████

██████████████████████ I told me I would start with a ████████████

████████████████ and then turn to obtaining a ████████████████. We hung

up and minutes later he called me back. ████████████████████████

██████████████████████████████ ████████████████████████

████████████. ████████████████████████████████████████

████████████████.

36. On ████████, I sent Mr. Donovan a draft waiver from ████████ and ████████████

████ for him to review and edit before I presented them to others. Exhibit W11. Mr.

Donovan never responded to my email.

37. On ████████, I was copied on correspondence from ████████████████████In his

letter, ████████████ recounted ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

12



38. Following ████████ letter to ████████████████████, I received a letter

from Karen Popp of Sidley Austin LLP.  In that letter, Ms. Popp informed me that she

represented Mr. Donovan and that he was not willing to participate in an interview.  She

cited ████████████████████████████████ t███████████████

████████ and the "potential tort law claims" that Mr. Donovan could face "that would be

costly and time-consuming to defend."  For the first time, I was informed that Mr.

Donovan was now taking the position that ████████████████████████████

████████████ before they could disclose anything related to ████████████.  This

position was contrary to the actions ████████████████████ had all

taken ████████ when they spoke to me about ████████████ without ████████

████████████████ Exhibit W13.

39. On October 20, 2020, I responded to Ms. Popp, informing her that Mr. Donovan had

previously discussed ████████████████████████████ with me

████████████████.  I also noted ████████████████████████

████████████████████████████████████████████████████████

████████████████████████ Exhibit W14.

40. Ms. Popp responded on October 22, stating that her client's hands "remain tied by his

ethical and contractual obligations" and was "thus prohibited from cooperating with your

investigation despite his desire to do so."  Exhibit W15.

41.  Four days later, I received a letter from Mr. Bolden.  In his October 26 letter███████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████.
████████████████████████████████████████████████
███████████████████████████████          ██████████,"██████████
███████████████████████████████          ████████████████

██████████████████████████████████     ██████████
attorneys for ███████ on his correspondence.

42.  I responded on October 30 to Mr. Bolden, rejecting the facts and conclusions asserted in

his letter, pointing out that, █████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████  I

reiterated that I would have never accepted the engagement under such a limitation.

███████████

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2020

████████████████████
————————————————————
Beth A. Wilkinson

# EXHIBIT W1

Subject:  Fwd: Employment Investigation
Date:     7/13/2020 10:35 AM
From:     "Norman Chirite" ████████████
To:       "Beth Wilkinson" ████████████████████

---

---------- Forwarded message ---------
From: **Norman Chirite** ████████████
Date: Mon, Jul 13, 2020 at 10:34 AM
Subject: Re: Employment Investigation
To: Friel, Lisa ████████████████
Cc: Will Rawson ████████████████

Hi Lisa, ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████

On Mon, Jul 13, 2020 at 10:31 AM Friel, Lisa ████████████████ wrote:

> Good morning Will and Norm,
>
> ████████████████████████████████████████████
> ████████████
>
> Lisa
>
> **Lisa M. Friel**
>
> *Special Counsel for Investigations*
>
> **National Football League**
>
> 345 Park Avenue
>
> New York, NY  10154
>
> Tel:  212-450-2000
>
> Direct tel: ████████████
>
> Fax: ████████████

Email:



**From:** Friel, Lisa
**Sent:** Saturday, July 11, 2020 6:48 PM
**To:** Will Rawson                        ; Norman Chirite
**Subject:** Employment Investigation


Will and Norm,



Lisa

Lisa M. Friel

Senior Vice President

Special Counsel for Investigations


Sent from my iPhone

# EXHIBIT W2

The Washington Post

# From dream job to nightmare

More than a dozen women allege sexual harassment and verbal abuse by former team employees at Redskins Park





Emily Applegate, photographed this week, said her year working for the Redskins was 'the most miserable experience of my life.' (Photo by Celeste Sloman for The Washington Post)

By **Will Hobson**, **Liz Clarke**

JULY 16, 2020

A few months after Emily Applegate started working for the Washington Redskins in 2014, she settled into a daily routine: She would meet a female co-worker in the bathroom during their lunch breaks, she said, to commiserate and cry about the frequent sexual harassment and verbal abuse they endured.

They cried about the former chief operating officer's expletive-laced tirades, Applegate said, when she recalled him calling her "f-----g stupid" and then requesting she wear a tight dress for a meeting with clients, "so the men in the room have something to look at." They cried about a wealthy suiteholder who grabbed her friend's backside during a game, Applegate said, and the

indifference the team's top sales executive displayed when she complained.

But most of all, Applegate said, they cried about the realization their dream job of working in the NFL came with what they characterized as relentless sexual harassment and verbal abuse that was ignored — and in some cases, condoned — by top team executives.

Applegate is one of 15 former female Redskins employees who told The Washington Post they were sexually harassed during their time at the club. The other 14 women spoke on the condition of anonymity citing a fear of litigation, as some signed nondisclosure agreements with the team that threaten legal retribution if they speak negatively about the club. The team declined a request from The Post to release former female employees from these agreements so they could speak on the record without fear of legal reprisal. This story involved interviews with more than 40 current and former employees and a review of text messages and internal company documents.

Team owner Daniel Snyder declined several requests for an interview. Over the past week, as The Post presented detailed allegations and findings to the club, three team employees accused of improper behavior abruptly departed, including Larry Michael, the club's longtime radio voice, and Alex Santos, the team's director of pro personnel.

In a statement, the team said it had hired D.C. attorney Beth Wilkinson and her firm, Wilkinson Walsh, "to conduct a thorough independent review of this entire matter and help the team set new employee standards for the future."

"The Washington Redskins football team takes issues of employee conduct seriously ... While we do not speak to specific employee situations publicly, when new allegations of conduct are brought forward that are contrary to these policies, we address them promptly," the team said.

The allegations raised by Applegate and others — running from 2006 to 2019 — span most of Snyder's tenure

as owner and fall into two categories: unwelcome overtures or comments of a sexual nature, and exhortations to wear revealing clothing and flirt with clients to close sales deals. Among the men accused of harassment and verbal abuse are three former members of Snyder's inner circle and two longtime members of the personnel department:

- Michael, senior vice president of content and "the voice of the Washington Redskins." Seven former employees said Michael routinely discussed the physical appearance of female colleagues in sexual and disparaging overtones. In 2018, Michael was caught on a "hot mic" speaking about the attractiveness of a college-aged intern, according to six former employees who heard the recording. Michael declined an interview request and retired Wednesday.



Alex Santos was fired as director of pro personnel last week. (Associated Press)

- Santos, the club's director of pro personnel, was accused by six former employees and two reporters who covered the team of making inappropriate remarks about their bodies and asking them if they were romantically interested in him. In 2019, Santos was the subject of an internal investigation after Rhiannon Walker, a reporter for The Athletic, informed club management Santos had pinched her, told her she had "an ass like a wagon," and repeatedly asked her to date him, Walker said in an interview with The Post. Nora Princiotti, a reporter for The Ringer who formerly covered the team, also said in an interview that she was harassed

/

by Santos. Santos, who was fired this past week, declined to comment.

- Richard Mann II, assistant director of pro personnel, who in one text message obtained by the The Post told a female employee he and his colleagues debated whether her breasts had been surgically enhanced and in another text message told another female employee to expect an "inappropriate hug … And don't worry that will be a stapler in my pocket, nothing else." Mann, who also was fired last week, declined to comment.

- Dennis Greene, former president of business operations, implored female sales staff to wear low-cut blouses, tight skirts and flirt with wealthy suite holders, according to five former employees, including Applegate. Greene's 17-year career with the club ended in 2018 amid a scandal over the revelation he had sold access to Redskins cheerleaders — including attendance at a bikini calendar photo shoot in Costa Rica — as part of premium

/

suite packages. Greene declined to comment.

- Mitch Gershman, former chief operating officer, who Applegate said routinely berated her for trivial problems such as printer malfunctions while also complimenting her body. Two other former female employees supported Applegate's account of her sexual harassment and verbal abuse by Gershman, who left the team in 2015.

"It was the most miserable experience of my life," Applegate, now 31, said of her year working as a marketing coordinator for the club, which she left in 2015. "And we all tolerated it, because we knew if we complained — and they reminded us of this — there were 1,000 people out there who would take our job in a heartbeat."

Gershman, in a phone interview, denied Applegate's allegations.

"I barely even remember who she is," Gershman said. "I thought the Redskins was a great place to work … I

would apologize to anyone who thought that I was verbally abusive."

No woman accused Snyder or former longtime team president Bruce Allen of inappropriate behavior with women, but they expressed skepticism the men were unaware of the behavior they allege.

"I would assume Bruce [Allen] knew, because he sat 30 feet away from me ... and saw me sobbing at my desk several times every week," Applegate said.

Allen, who was fired at the end of last year, did not reply to interview requests.



Team owner Daniel Snyder, left, with former president and general manager Bruce Allen on the sideline before a Monday Night Football game at FedEx Field. (Jonathan Newton / The Washington Post)

/

While Applegate and others did not accuse Snyder of acting improperly with women, they blamed him for an understaffed human resources department and what they viewed as a sophomoric culture of verbal abuse among top executives that they believed played a role in how those executives treated their employees.

Snyder routinely belittled top executives, according to three former members of his executive staff, perhaps most intensely Greene, the former sales executive, whom Snyder mocked for having been a male cheerleader in college. After one executive staff meeting, according to one former employee, Greene said Snyder had ordered him to do cartwheels for their entertainment.

"I have never been in a more hostile, manipulative, passive-aggressive environment ... and I worked in politics," said Julia Payne, former assistant press secretary in the Clinton Administration who briefly served as vice president of communications for the team in 2003.

Payne did not witness or endure
sexual harassment, she said, but she
supported what many other former
employees said about the culture
under Snyder.

"With such a toxic, mood-driven
environment, and the owner behaving
like he does," said Payne, "How could
anyone think these women would go
to HR?"



A team flag flies above Redskins Park in Ashburn, Va., (Jim Lo Scalzo / EPA-EFE/REX/Shutterstock)

# Unwelcome advances

On the first day of working for the team, new employees are given a manual that describes the organization's core values.

"Congratulations on becoming a member of an elite team of people involved in a franchise with a tremendous past and a promising future," the handbook states. "The level of media and public scrutiny of the Washington Redskins magnifies any inappropriate or unprofessional behavior, so a high level of professionalism is required from all employees."

While there is a section discussing sexual harassment, many former employees said, if there is a process for handling sexual harassment complaints, it's never discussed in the club's brief onboarding process.

"It was the most miserable experience of my life. And we all tolerated it, because we knew if we complained — and they reminded us of this — there were 1,000 people out there who would take our job in a heartbeat."

— Emily Applegate, Redskins employee in 2014 to 2015

The team's human resources staff consists of one full-time staffer — who also performs administrative duties at team headquarters — responsible for more than 220 full-time employees, according to several former employees.

"There's no HR," said one former veteran female employee who left in 2019. "And there was never a reporting process, nor was one explained to new employees about how you should report something."

In a statement, the Redskins pointed out the team hired a new human resources manager in 2019, and this employee works with the team's legal department on any issues involving employee conduct.

Former women employees said the first few weeks at Redskins Park also often came with an informal, but invaluable, orientation administered privately by veteran female employees who warned them to avoid certain people and places, such as the staircase near the entrance to team headquarters.

Lined at the top with transparent plexiglass, the stairs descend from the lobby to the locker room and training area, and someone standing at the bottom can look up the skirt of a woman standing at the top.

One former female member of the executive staff learned this lesson early in her tenure, she said, when she looked down to see a male trainer, two floors down, staring right back up, walking step for step with her.

"He even leaned to get a better angle," the woman said. "He wasn't even trying to hide it."

For many women, their jobs with the team were their first out of college. Several expressed a sense of shame, and said they realized they had accepted behavior years ago they now realize was inappropriate, such as an unwanted shoulder rub or a compliment about their legs.

"It was my first job, so I kind of normalized it," said a woman who worked for the club for several years and departed in 2019. "And it was happening to every single one of my female co-workers under the age of 40."

Training camp in Richmond in August was a hotbed of improper activity, several women said. Some encouraged younger female staffers to avoid the

Tobacco Company, a bar and restaurant in a stately brick building frequented by team officials.

"I was propositioned basically every day at training camp," said one female employee who worked for the team in the mid-2010s for several years. The overtures came in the form of a whispered invitation from one coach at the Tobacco Company to his hotel room, she said, as well as emails and text messages from other male staffers, also disclosing their room numbers and offering invitations for late-night visits.

Attending the annual NFL scouting combine in Indianapolis, former female employees said, also heightened the likelihood of unwanted attention and propositions at places such as Prime 47, a steakhouse and bar popular with league officials and journalists.

# "I have never been in a more hostile, manipulative,

passive-aggressive environment ... and I worked in politics. ... With such a toxic, mood-driven environment, and the owner behaving like he does, how could anyone think these women would go to HR?"

— Julia Payne, former assistant press secretary in the Clinton Administration who briefly served as vice president of communications for the Redskins in 2003.

At the 2019 combine, Rhiannon Walker, new to the Redskins beat for The Athletic, arrived at Prime 47 to learn that Santos, the club's scouting director, had been asking her reporting colleagues if they thought she might be interested in him, she said in a phone interview this week. They tried to discourage him — outside of the ethical concerns,

Walker said, her colleagues knew she
was in a committed relationship and
wouldn't ever date a married man —
but Santos was undeterred, she said
she was told upon arriving.

Santos approached, she said, and the
conversation started innocently. He
showed her photos of his wife and
young daughters on his phone, Walker
recalled, reading from notes she later
provided to her company's lawyers
describing the incident. Then Santos
told Walker she had "worn the f---"
out of her jeans the day before, she
said, and asked if she would date him,
if they were single.

"I told him that I do have a girlfriend,
and he does have a wife, so we don't
need to play hypotheticals here,"
Walker said. "I was pretty blunt."

Santos kept attempting to flirt for
several minutes and told Walker he
would "wear me down with his
charm," she recalled. Then he pinched
her on the hip, in full view of other
team employees and reporters, she
said. Walker felt humiliated, she
recalled, and concerned some people

who saw what had happened would
think she had welcomed the attention.

"It felt like pretty much the worst
thing in the world," Walker said. "He
didn't care. He thought it was funny."

Walker later filed a complaint with the
team. In a statement, The Athletic
supported her account, and confirmed
the company's attorneys spoke with
Redskins management about Walker's
allegations.

"The Athletic unequivocally stands by
Rhiannon Walker's account of the
harassment she endured from Mr.
Santos," the company said.

Soon after her incident with Santos,
Walker said, she learned of another
reporter who alleged she had endured
similar harassment: Nora Princiotti,
who covered the team for the
Washington Times in 2017.

Princiotti, in a phone interview, said
on two or three occasions, Santos
pulled his SUV alongside her as she
was walking out of Redskins Park, and
offered commentary on her body and
wardrobe.

"He told me I had a great ass for a little white girl," Princiotti said. "The general sentiment was that I should wear less clothing."

Like Walker, Princiotti said she was struck by how brazenly Santos acted, as well as other team employees who commented on her looks. Princiotti said one male member of the communications staff once told her she had a nickname around Redskins Park: "Princihottie."

"It was gross and also just a terrible pun," she said. "There was an overwhelming sense that no one would ever do anything about this stuff."

Walker informed Tony Wyllie, then the team's vice president of communications, about Princiotti's allegations, she said, and Princiotti confirmed she spoke to Wyllie about Santos. Wyllie, who left the team in 2019, declined to comment for this story. A few weeks later, team lawyers informed The Athletic that Santos had been disciplined but declined to specify how, Walker said.

Santos was fired last week, after The Post informed the team of allegations raised by other former female staffers. One former female staffer said she received a text, one night after work, in which Santos told her he had wanted to kiss her that day in the break room. Another former female employee said Santos told her, as she was walking into the office one day, she had a "nice butt" and asked her to turn around for him.

"I am done with the NFL," the woman said. Her experience with the Redskins "has killed any dream of a career in pro sports."

**Conversation between Richard Mann II and a former female Redskins employee**





Composite image of multiple screenshots. (Provided screenshots/The Washington Post)





Composite image of multiple screenshots. (The Washington Post)

Santos was fired along with his top scouting assistant Richard Mann II, who sent flirtatious, sexual texts to two former female employees they provided to The Post.

In an exchange with one former female colleague, Mann joked about getting an "inappropriate hug." In two exchanges with another female colleague, Mann informed her he and his colleagues were discussing whether her breasts had been surgically enhanced — "real or fake is the debate," he texted — and offered to bring her lunch for a favor.

"If I bring that I want to squeeze your butt," Mann texted.

"Unfortunately that was (is?) the culture," one of these women texted a reporter, after forwarding the messages. "So we felt like we had to roll with it."

In a phone interview, new team Coach Ron Rivera declined to discuss why Santos and Mann were dismissed.

"We're trying to create a new culture here" Rivera said. "We're hoping to get people to understand that they need to judge us on where we are and where we're going, as opposed to where we've been"

**Conversation between Richard Mann II and a former female Redskins employee**



Composite image of multiple screenshots.

# 'Voice of the Redskins'

To fans and the general public, Larry Michael is perhaps one of the more consistent aspects of a franchise marked by regular personnel turnover. The team's lead play-by-play broadcaster for the past 16 years, Michael also served as senior vice president in charge of content, overseeing the club's website and video department.

But among his mostly male staff on the video and digital teams, Michael for years had become a growing source of discomfort, according to four former employees, because of his penchant for off-color commentary about female colleagues.

"It was always objectifying; it was always derogatory. ... I wouldn't even know what to do. I would just shake it off," one former male staffer said. "We're all just afraid for our jobs and trying to make it."

During training camp in 2017, Michael saw a young woman from the sponsorship staff walk by and turned to one of his staffers and commented on her "tight ass," before adding a remark about her social life, the staffer said.



Broadcasters Larry Michael, left, and Sonny Jurgensen at FedEx Field in 2004. (John McDonnell/The Washington Post)

"He said you can't mess with her, though ... because you know she's f----g every guy on the team, right?," said this staffer, who afterward mentioned the comment to four colleagues, including a veteran female employee.

"I was mortified, but not surprised," the female employee said. Years earlier, Michael had squeezed this woman's face after a late-night taping of a team program and told her "she was so cute," she said.

Another comment, recalled by two former male employees, involved a female colleague of Egyptian descent.

"He said it looked like she definitely had a little Greek in her because of her lighter skin complexion, as well as that ass," one former male employee said.

None of these employees filed formal complaints, they said, because they never thought anything would come of it.

"They're not going to get rid of 'The Voice of the Redskins' ... over a $30,000-a-year marketing manager," one former male staffer said.

Michael was the subject of one complaint in 2018, according to six former team staffers, after he was recorded discussing one female intern during practice one day. The incident

occurred as Michael was being filmed
for a team video production, former
employees said, and an intern walked
by.

Former team employees who heard
the video had different recollections of
the precise wording, but agreed
Michael remarked about how
attractive he found the intern, who
was in college.

"It was disgusting," said one former
female employee who heard the audio.
"This is a grown man who could be my
grandfather, and he's talking about
someone younger than me."

One female employee complained
about the video to the club's legal
department, and a team attorney took
the hard drive from the employee who
had discovered the video. When the
lawyer returned the hard drive, this
employee said, the file had been
deleted. It was unclear to staffers
aware of the incident whether Michael
was disciplined.

"The club's legal department removed
the file from the hard drive and
maintained the file in the

organization's confidential HR/Legal records where it still resides," the team said in a statement.

On Wednesday morning, The Post requested an interview with Michael and informed club officials about comments attributed to Michael by his former employees and the "hot mic" incident.

Hours later, Michael announced his retirement.

"After 16 great years my time with the organization is over," Michael said in a statement. "On to the next chapter."



Snyder has owned Washington's NFL franchise since 1999. (Toni L. Sandys/The Washington Post)

# Volatile environment

Before Emily Applegate changed jobs in December 2014, moving from working at FedEx Field to the team's marketing department in Ashburn, she was warned by co-workers about her new boss, Mitch Gershman, she recalled. The club's chief marketing officer had a reputation for an

explosive temper, Applegate said, but not sexual harassment.

"I guess I was lucky enough to be more his type," Applegate said.

Gershman often commented on her body or appearance, she said, in tandem with insults about her work performance.

"He would tell me I was stupid for not being able to print something out the way he wanted, and directly follow with, 'Oh, did you run extra yesterday, you look really good,'" Applegate said.

Gershman told Applegate never to wear flats, only heels, she said, and suggested form-fitting dresses for nighttime events with premium clients. He also inquired about her dating life, and expressed concern she didn't have a boyfriend, she said. In a text message exchange Applegate provided to The Post, she asked him about his plan for an upcoming sales meeting.

"Not part of it. No worries. Go find a dude!!" he replied.

There were also routine outbursts of
rage, Applegate said, such as when
Gershman got lost on the way to Joe
Theismann's Restaurant in
Alexandria, after asking her to print
out directions for him.

"All he had to do was type it in a GPS,
and he spent 20 minutes screaming at
how f-----g incompetent I was for not
giving him proper directions," she
said. "I would leave work crying
probably four days out of the week."

Gershman, in a brief phone interview,
alternately denied and said he didn't
recall conversations referenced by
Applegate.

"I can't comment on something that I
can't remember," he said.

**Conversation between Mitch
Gershman and Emily Applegate**



Composite image of multiple screenshots of text messages. (Screenshots by Emily Applegate/The Washington Post)

One other team executive repeatedly commented on Applegate's appearance, she said: Dennis Greene, who held the high-pressure job of overseeing sales of luxury seating and premium suites at FedEx Field.

On one occasion, Applegate said, Greene complimented her on leggings she was wearing.

"He made a comment about how great I looked in these leggings because they were so tight," she said. "That was actually the only time Mitch said something like, 'Dennis, you can't say something like that.' "

Women who worked for Greene hold conflicting feelings about their former boss. While they acknowledge he made inappropriate remarks and pressured them to wear revealing outfits and flirt with current and prospective suiteholders, they also were aware Greene faced tremendous pressure from Snyder to sell expensive seats for a team whose on-the-field product often made his job challenging.

Snyder "would humiliate Dennis in front of other executives because he was a cheerleader in college ... and Dennis took everything. He did everything and anything he had to, to make sure those suites were sold out year after year," one former saleswoman said.

But even those sympathetic to Greene said his conduct left them with

emotional scars. One saleswoman, who worked in the 2005 to 2010 time frame, recalled that Greene repeatedly offered to connect her with a plastic surgeon if she wanted breast enhancement surgery. He said he knew a doctor who had performed several procedures for cheerleaders, she recalled, and he could "get her a great rate."

"Reducing a young woman to thinking that she can only do her job well if she wears a certain thing or exposes part of her body is demeaning," this former saleswoman said. "It puts women in their place."



'I don't see what I have to be afraid of,' Applegate says. 'I'm just telling the truth.' (Celeste Sloman for The Washington Post)

# Retribution concerns

Over the past few days, Applegate said, she has received messages from several former Redskins co-workers who have asked if she's concerned about potential retaliation she could face from the club. She has told them she's not concerned, she said. She has no interest in working in professional

sports again, took the LSATs this week, and is studying for law school.

"I don't see what I have to be afraid of," she said. "I'm just telling the truth."

To some of her former colleagues, there is one anecdote from Applegate's time with the team that troubles them most. In 2015, Applegate said, she was pulled aside by Eric Schaffer, the club's general counsel and senior vice president, who left earlier this year.

Schaffer was appalled by the verbal abuse Applegate endured from Gershman, she said he told her, and he offered to serve as a witness or connect her with a lawyer if she wanted to file a formal complaint. Applegate declined, and said she feared making an issue of Gershman's conduct would mark the end of her career with the team.

# "I barely even remember who she

is. I thought the
Redskins was a
great place to work
... I would apologize
to anyone who
thought that I was
verbally abusive."

— MItch Gershman, former chief operating
officer, who left the organization in 2015

Applegate regards Schaffer as one of
the few male team executives who
treated her well. Some of her former
colleagues, however, expressed
outrage that Schaffer didn't file a
complaint of his own. According to the
employee manual, "all supervisory
and management personnel of the
Redskins organization are expected to
take immediate and appropriate
action to prevent or stop harassment
in the workplace of which they
become aware."

Schaffer declined to comment.
Applegate said she understands why
he didn't make an issue of her

treatment in 2015. It's the same
reason she never filed a complaint.

"I needed to keep my job," she said.
"When it comes down to it, 98 percent
of people make decisions on stuff like
this based on needing to keep their
jobs … which is why this stuff goes on
for so long."

*Les Carpenter, Kareem Copeland,*
*Adam Kilgore and Sam Fortier*
*contributed to this report.*

# EXHIBIT W3

# STATEMENT FROM OWNER DAN SNYDER.

The behavior described in yesterday's *Washington Post* article has no place in our franchise or society.

This story has strengthened my commitment to setting a new culture and standard for our team, a process that began with the hiring of Coach Rivera earlier this year.

Beth Wilkinson and her firm are empowered to do a full, unbiased investigation and make any and all requisite recommendations. Upon completion of her work, we will institute new policies and procedures and strengthen our human resources infrastructure to not only avoid these issues in the future but most importantly create a team culture that is respectful and inclusive of all.

# EXHIBIT W4

# NFL Statement

These matters as reported are serious, disturbing and contrary to the NFL's values. Everyone in the NFL has the right to work in an environment free from any and all forms of harassment. Washington has engaged outside counsel to conduct a thorough investigation into these allegations. The club has pledged that it will give its full cooperation to the investigator and we expect the club and all employees to do so.  We will meet with the attorneys upon the conclusion of their investigation and take any action based on the findings.

# EXHIBIT W5

**From:** Norman Chirite ▮▮▮▮▮▮▮▮▮▮

**Sent:** Saturday, July 18, 2020 3:29 PM

**To:** ▮▮▮▮▮▮▮▮▮▮

**Subject:** Connect?

On Sat, Jul 18, 2020 at 3:16 PM Beth Wilkinson ▮▮▮▮▮▮▮▮▮▮ wrote:
Will call in 5.

**Beth Wilkinson** | Founding Partner
**WILKINSON WALSH LLP**
2001 M Street NW, 10th Flr, Washington, DC 20036

> On Jul 18, 2020, at 3:15 PM, Norm Chirite ▮▮▮▮▮▮▮▮ wrote:
>
> ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮
> ▮▮. Thanks -Norm
>

The information contained in this communication is confidential, may be attorney-client privileged and constitute protected work product, may constitute inside information, and is intended only for the use of the intended addressee. It is the property of Wilkinson Walsh LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email and destroy this communication and all copies thereof, including all attachments.

1

# EXHIBIT W6





# EXHIBIT W7

The Washington Post

# Lewd cheerleader videos, sexist rules: Ex-employees decry Washington's NFL team workplace



Clockwise from top left: Megan Imbert, Tiffany Bacon Scourby, Alicia Klein, Shannon Slate and Rachel Engleson (Photos by Toni L. Sandys/The Washington Post; Jesse Ditmar, Erich Schlegel and Nathan Morgan for The Washington Post)

By **Will Hobson**, **Beth Reinhard**, **Liz Clarke** and **Dalton Bennett**

AUGUST 26, 2020

   

In "Beauties on the Beach," the official video chronicling the making of the Washington NFL team's 2008 cheerleader swimsuit calendar, the

women frolic in the sand, rave about their custom bikinis and praise a photographer for putting them at ease in settings where sometimes only a strategically placed prop or tightly framed shot shielded otherwise bare breasts.

What the cheerleaders didn't know was that another video, intended strictly for private use, would be produced using footage from that same shoot. Set to classic rock, the 10-minute unofficial video featured moments when nipples were inadvertently exposed as the women shifted positions or adjusted props.

The lewd outtakes were what Larry Michael, then the team's lead broadcaster and a senior vice president, referred to as "the good bits" or "the good parts," according to Brad Baker, a former member of Michael's staff. Baker said in an interview that he was present when Michael told staffers to make the video for team owner Daniel Snyder.

Snyder and the team provided no comment after they were given

repeated opportunities to respond to this and other allegations in this story.

Michael adamantly denied the allegation.

"Nothing can be further from the truth. I was never asked to nor did I ask someone to compile videos as you described," Michael said.

Baker recalls otherwise.

"Larry said something to the effect of, 'We have a special project that we need to get done for the owner today: He needs us to get the good bits of the behind-the-scenes video from the cheerleader shoot onto a DVD for him,'" said Baker, who was a producer in the team's broadcast department from 2007 to 2009.

The Washington Post obtained a copy of the 2008 video from another former employee, along with a similar outtakes video from the squad's swimsuit calendar shoot in the Dominican Republic in 2010 that included a close-up of one cheerleader's pubic area, obscured only by gold body paint.

In addition, a former broadcasting producer for the team told The Post that Michael ordered that the 2010 video be burned to a DVD titled "For Executive Meeting." The former producer did not recall Michael mentioning Snyder. Both former employees spoke on the condition of anonymity because they feared retaliation. Michael denied knowledge of any such videos.



The new allegations come at a perilous time for Washington Football Team owner Daniel Snyder. (John McDonnell/The Washington Post)

On Aug. 18, The Post emailed the team's public relations representative a summary of its reporting and detailed questions. The team, through its public relations firm and lawyer, requested additional days to respond and did not accept repeated offers

from The Post to show team officials these videos. Ultimately, the team provided no comment, and Snyder did not agree to an interview.

In response to a Post report last month detailing allegations of widespread sexual harassment in his team's front office, including by Michael, Snyder publicly stated that such behavior "has no place in our franchise" and hired a law firm to "set new employee standards for the future."

But interviews with more than 100 current and former employees and a review of internal company documents and other records show that, in his 21 years of ownership, Snyder has presided over an organization in which women say they have been marginalized, discriminated against and exploited. The employees also described an atmosphere in which bullying and demeaning behavior by management created a climate of fear that allowed abusive behavior to continue unchecked.

Twenty-five women — most of them speaking on the condition of anonymity because of nondisclosure agreements or fear of reprisal — told The Post that they experienced sexual harassment while working for the team. They described male bosses, colleagues and players commenting on their bodies and clothing, incorporating sexual innuendos into workplace conversation and making unwanted advances in person or via emails, text messages and social media. Many said they were motivated to speak out because they were angered by Snyder's comments after The Post report last month that detailed allegations from another 17 women, which they read as an attempt to distance himself from the workplace culture described.

**Washington Post report**

17 women accuse former Redskins employees of sexual harassment and verbal abuse .
Read related story

One of the women interviewed for this story accused Snyder of directly humiliating her, the first such claim made to The Post. Former cheerleader Tiffany Bacon Scourby said Snyder approached her at a 2004 charity

event at which the cheerleaders were performing and suggested she join his close friend in a hotel room so they "could get to know each other better." Scourby's account was supported by three friends she spoke to shortly afterward about the alleged incident, including the team's former cheerleader director.

Many of the women who have come forward in recent weeks with harassment allegations pointed to former executives named in the previous Post report: Alex Santos, the recently fired pro personnel director; Michael, the club's longtime radio voice and a senior vice president, who abruptly retired last month; Dennis Greene, former president of business operations, who left in 2018 amid allegations he had sold access to cheerleaders; and Mitch Gershman, former chief operating officer, who left in 2015. Santos and Gershman declined to comment for this story. Greene did not respond to requests for comment.



Larry Michael, left, the team's former radio voice, denied asking for an outtake video from cheerleaders' swimsuit footage featuring partial nudity. (John McDonnell/The Washington Post) A former intern said she tried to lodge a sexual harassment complaint in 2016 against Alex Santos, right, the recently fired pro personnel director, and was told she would have to avoid Santos or quit. (AP) (John McDonnell/The Washington Post; Associated Press)

Some women described an overwhelming sense of helplessness and an absence of options because the team's one-person human resources department has been supervised by executives who appeared, to them, to condone this behavior. One former intern said she tried to lodge a sexual harassment complaint against Santos in 2016, but Stephen Choi, the organization's chief financial officer, told her the team had a "male-dominated culture" and she would have to avoid Santos or quit. She quit. Choi declined to comment.

Many women also said gender-based official policies and informal practices limited their ability to do their jobs and denied them opportunities for career advancement.

Alicia Klein, a 27-year-old Georgetown University graduate student when she interned for the team in 2010, said she passed up a chance to extend her internship because she felt so uncomfortable about male executives constantly remarking on her looks.



Alicia Klein was an intern with the team in 2010.

"It was pervasive," said Klein, now a sports executive and professor in Brazil. "I didn't tell anyone because it was embarrassing and demeaning, and I wanted to tell everyone that I had worked in the NFL."

In 2017, at Choi's direction, the team's human resources staffer emailed all employees a "conduct policy" restricting the

movement of women in the building to minimize their interaction with players. The email made formal what long had been an understood directive, according to several former employees, that women should avoid football operations areas out of concern they would distract players.

Several women said they endured harassment and verbal abuse that left lingering emotional damage. Some formed an informal online "support group" for former team employees. Some said they felt working for the team left them with post-traumatic stress disorder.

Brittany Pareti, a D.C.-area marketing executive who worked in the team's community and charitable programs from 2007 to 2012, said she became so angry and depressed during her time with the team that her family staged an intervention to convince her to seek therapy.

"It was like fresh meat to a pack of wolves every time a new pack of interns would come in," Pareti said. "It was like a frat house, with men

lined up in the lobby watching women walk in and out. You constantly felt there were eyes on you."

Pareti and Scourby are among 12 former team employees who have retained attorney Lisa J. Banks, partner in the D.C. firm Katz, Marshall and Banks, which specializes in civil rights, employment and sexual harassment law.

"A workplace culture this toxic and pervasive, at the highest levels of the organization, simply cannot exist without the knowledge and encouragement of the owner," said Banks, whose firm represented Palo Alto University professor Christine Blasey Ford when she went public in 2018 with accusations of sexual assault against then-Supreme Court nominee Brett M. Kavanaugh, who denied them.

Some former team employees were referred to Banks by the Time's Up Legal Defense Fund, an initiative that connects women who are sexually harassed at work with legal and public relations professionals.

The new allegations come at a perilous time for Snyder, 55, who recently dropped the team's name under pressure from sponsors and critics who said it was racist. He also faces the possible exodus of his three co-owners, who are trying to sell their collective 40 percent stake in the franchise.

Snyder has gone to court twice in recent weeks to defend his reputation. He sued an online media company for publishing what he said were defamatory stories about him.

Snyder also is accusing a former employee, Mary Ellen Blair, and her landlord of helping to orchestrate and bankroll those stories. The landlord is a company led by the son-in-law and daughter of Dwight Schar, one of the minority owners seeking to sell his share of the team. Blair and the company have denied the allegations. In an Aug. 21 court filing, lawyers for the company, Comstock Holdings, characterized Snyder's pursuit of financial information to bolster his claim as a "speculative fishing expedition."

 

LEFT: Snyder last week made Jason Wright the NFL's first Black team president. (Alex Brandon/AP)
RIGHT: Snyder hired Julie Donaldson last month to replace Michael as senior vice president of media. (Astrid Riecken for The Washington Post)

Since the first Post report, Snyder has diversified his team's senior leadership with two high-profile hires. Last week, he named Jason Wright, a former NFL player and partner at the consulting firm McKinsey & Company, as team president; Wright is the first Black person to hold that title in the NFL. Last month, Snyder hired sports broadcaster Julie Donaldson to replace Michael as senior vice president of media, making her the team's highest-ranking woman.

Snyder also hired D.C. attorney Beth Wilkinson to conduct a "full, unbiased investigation" of the workplace. Many former employees told The Post they hope the NFL takes over the investigation to ensure thorough

scrutiny of Snyder's conduct. Several incidents they recounted may violate the NFL's personal conduct policy, which requires team owners, staff members and players to avoid "conduct detrimental to the integrity of and public confidence in the National Football League."

"An independent investigation is needed," Pareti said. "We cannot trust a report from this organization to be unbiased."



Former Washington cheerleader Tiffany Bacon Scourby said Snyder approached her at a 2004 charity event and suggested she join his friend in a hotel room. (Toni L. Sandys/The Washington Post)

# An indecent proposal

Cigar smoke and the laughter and chatter of more than 2,000 of the region's wealthiest men filled the Washington Hilton ballroom as Fight Night — the bawdy, boxing-themed charity event that was discontinued after last year's edition — got underway on a November evening in 2004.

The centerpiece of the event, which raised money for children's charities, was a boxing ring where young fighters competed and Washington's cheerleaders performed.

Snyder wasn't a Fight Night regular, attendees said, but a photographer captured him in his tuxedo that night with his arm around Schar. Snyder won an auction for a limited edition Harley-Davidson motorcycle, spending $80,000.

Scourby said she had finished dancing in the ring with her teammates —

wearing black bustiers, gold shorts
and black fishnet arm stockings — and
returned to mingling with guests and
selling copies of that year's swimsuit
calendar when she saw Snyder.



Washington cheerleaders perform as part of the Fight
Night benefit. Scourby said this is where Snyder made
the suggestion. (Rich Lipski/The Washington Post)

"Tiffany!" Scourby recalled Snyder
calling to her. Then 26, she had never
spoken to Snyder before, she said, and
was surprised he knew her name.

Scourby recalled a brief, awkward
conversation before Snyder said, "You
know, Tony is here," and gestured to
Anthony Roberts, his longtime friend,
who was 40 years old at the time.

Roberts, an eye doctor, had performed
LASIK surgery on Scourby the year
before — one of her friends had

recommended him — and she said she had noticed him in Snyder's suite at FedEx Field before a game a few months later, peering through binoculars and waving at her.

The "official ophthalmologist" of the team, Roberts has known Snyder since they were classmates at a Rockville high school. As teenagers, they watched Washington games together at Snyder's home in Silver Spring, according to a 1999 Post story. When Snyder had one of his first successful business forays, at 22, he and Roberts bought Porsches together.

"We have a hotel room," Snyder said that 2004 night, according to Scourby. "Why don't you and Tony go upstairs and get to know each other better?"

Scourby said she laughed sheepishly and waited for a laugh from Snyder that would indicate he was joking. He didn't laugh, she said.

"Oh, I'm working. Have a great time," Scourby said she told him before quickly walking back into the crowd. Later that night, she confided in

Donald Wells, the cheerleader
director, about the conversation.

"I remember her saying, 'Daniel
Snyder offered me the suite with one
of his friends,' " said Wells, who led
the squad from 1997 to early 2009,
when he was laid off with roughly 20
other employees amid the economic
downturn. "She was more or less
propositioned."



Anthony Roberts, left, is Snyder's longtime friend.
They were classmates at a Rockville high school.
(Michael S. Williamson/The Washington Post)

Two other people supported Scourby's
recollection of that evening: her
boyfriend at the time, who spoke on
the condition of anonymity, and a
longtime friend, who said Scourby
told her about the incident a few days
later.

Snyder "let it be known he had a room in the hotel and Tiffany and his friend should go get to know each other better," recalled Kristi Kelly, a cannabis industry executive who lives in Michigan. "She gracefully exited the conversation."

Years later, Scourby said, she is still unsure whether Roberts knew about Snyder's remark. Roberts did not respond to repeated requests for comment from The Post.

"There's a power dynamic, and Dan Snyder looked down on me," Scourby said. "Because he's powerful and our employer, he thinks he somehow has the right to say these things to us, to make these requests of us, and he doesn't. It's disgusting."

Scourby continued to work as a cheerleader for four years after that Fight Night, serving as team captain in 2008 and representing the team at the 2009 Pro Bowl. A 42-year-old single mother of two young boys, she said she maintains a connection to the team's cheerleaders as a sideline

assistant, a volunteer coaching
position.

This is Scourby's second allegation of
inappropriate behavior against a high-
profile man. In 2017, she accused
actor Jeremy Piven of sexually
assaulting her in 2003 during a brief
encounter in New York. Piven denied
the allegation, along with similar
claims of sexual misconduct by seven
other women. CBS canceled the drama
he was starring in at the time.

"Powerful men in powerful positions
need to realize that they can't do this,"
she said.



Brad Baker said Larry Michael ordered the outtake video for team owner Daniel Snyder. (Nathan Morgan for The Washington Post)

# 'For Executive Meeting'

The request for the unofficial cheerleader video came after a routine production meeting in 2008, according to Baker, a former production manager in the team's broadcasting department. The

cheerleaders recently had returned from their calendar shoot that year in Aruba.

Baker said Michael excused two female colleagues and asked him to stay, along with two male colleagues: Tim DeLaney, then vice president of production, and Marc Dress, a videographer.

After Michael asked for the video of "the good bits," there was an awkward pause, said Baker, who was unsure what they were being asked to do.

"Yeah, I'll take care of it,' " DeLaney said, according to Baker.

Later that day, Baker said, he walked into the editing room to find DeLaney, assisted by Dress, assembling footage that included multiple shots of cheerleaders' exposed nipples. His co-workers appeared visibly uncomfortable doing the work, he said.

"Nobody said anything; it was just palpable tension," said Baker, who was among those laid off in 2009 and now lives in Nashville.

The door, which typically would be open, was shut, Baker said. His co-workers spoke in hushed tones, he said, and when he left the room, DeLaney told him to close the door.

DeLaney and Dress disputed Baker's account.

"I was never asked to create an outtakes video, and I have no knowledge of anyone creating one or even being asked to create one," said DeLaney, now vice president of broadcast and digital content for the Arizona Cardinals. "I certainly would have remembered that conversation had it happened."

"I've never seen anything like that," said Dress, now an independent videographer in Maryland. "I was a shooter; I shot it. What happened after I turned it in, I can't tell you."

Megan Imbert, a former producer in the broadcast department, said she walked into an editing bay in the summer of 2008 and saw an image on the screen she learned years later from Baker was part of this video: a zoomed-in shot of a cheerleader's

bikini bottom, focused on the pubic area.

"I thought: 'That's a really weird place for a shot to be stopped. ... I hope that's never used for anything,' " Imbert said.

The 10-minute outtakes video was created June 9, 2008, according to metadata in the video file. A technical analysis by The Post and a researcher from the Informedia Lab at Carnegie Mellon University found no evidence that it had been manipulated. It and a promotional video broadcast by the team share what appear to be identical frames from a topless photo shoot, with the official version blurred and the outtakes version in sharp focus.

The 2010 video featuring partly nude cheerleaders was created June 22 that year, according to its metadata, shortly after the year's calendar shoot in the Dominican Republic. Both videos share the same soundtrack: The Rolling Stones' "Jumpin' Jack Flash," Aerosmith's "Sweet Emotion" and U2's "Mysterious Ways." In both

outtakes videos, the cheerleaders look directly at the camera repeatedly.

The Post showed the videos to Banks, Scourby's attorney, who also represents Baker.

"It is absolutely appalling — but perhaps not surprising — that the Washington football organization would produce these highly sexualized videos without the knowledge or consent of the women featured," Banks said. "The videos appear to have been created to serve no other purpose than to satisfy the prurient interests of the team's executive leadership."

The former employee who provided both videos to The Post described seeing a producer splice the footage together for the 2010 video. According to the former employee, the producer identified the footage as "outtakes of the recent cheerleader shoot" and said the video was being compiled for Snyder.

The former employee told The Post, "I saved the video because I didn't think anyone would believe it was real." This

former employee decided to provide the videos to The Post after its July 16 report, out of a desire to see the NFL "hold the team more accountable."

The producer did not recall the brief exchange described by the former co-worker but said it was plausible because the outtakes were put together in a shared editing room. The producer said Michael asked for the calendar footage to be scoured for "the good stuff" — partially nude and other salacious moments — and to splice it together onto a DVD titled, "For Executive Meeting." Michael never said explicitly that the video was for Snyder, according to the producer, who said two copies were given to Michael.

The producer viewed the 2010 video obtained by The Post and confirmed its authenticity. In an interview, the producer expressed shame for taking part in its production. "It was extremely unprofessional and perverted, the kind of culture that would only exist in a world where there were barely any women in powerful positions, no human

resources and no accountability," the producer said.

Contacted by The Post, Michael had no explanation for who edited the videos reviewed by The Post and said he could not explain why multiple, lower-level employees who worked for the team in different years said managers had ordered up the videos for team executives. The former employee who provided the videos to The Post reached out through a newsroom tip line. Baker separately told The Post what he recalled about the 2008 version. Post reporters then contacted former employees from the same time period, including the one who confirmed making the 2010 video.

In interviews with The Post, as they learned about the unofficial videos for the first time, several former cheerleaders said they felt exploited by an organization that, at the time, paid them each about $1,000 per year.



Scourby, center, and other cheerleaders dance during
a game in 2008. (Drew Hallowell/Getty Images)

Heather Tran, who posed for the 2008
calendar, said she asked for a "closed
shoot," in which only essential staff,
the photographer and the
videographer were allowed to attend.

"I feel betrayed and violated," said
Tran, who was 29 when she posed
topless. In the authorized version of
the video, several beaded necklaces
covered parts of her breasts; in the
unauthorized version, her nipples are
briefly exposed.

Now a 41-year-old business analyst,
she cheered for the team from 2004 to
2010 and has worked as a sideline
assistant since then. Shown the 2008
outtakes video, she said she was sure
it was compiled from the same footage
as the promotional videos broadcast
on television and online.

Scourby was involved in both shoots: in 2008 as a cheerleader and in 2010 as a volunteer helping to coordinate the shoot. She also viewed the videos and said she was certain the footage came from the team's videographers.

"I'm horrified. I'm nauseous," Scourby said. "The video was a huge violation of my sisters and I."

Wells, the longtime cheerleader director, was so taken aback by the news of the videos that he cried.

"I worked so hard to protect them," he said. "They are daughters and wives and mothers. This is disgusting."

Another former cheerleader, Brittni Abell, whose nipples were visible through body paint in the 2010 outtakes but airbrushed in the official promotional videos that year, issued a statement through lawyer Gloria Allred: "If these allegations are true, the use of my image in such an inappropriate manner, without my knowledge or consent, is reprehensible and appalling."



Megan Imbert, who worked for the team from 2008 to 2011, said, "The fear is instilled in employees from Day One." (Erich Schlegel for The Washington Post)

# 'Led by fear'

Shortly after reporting for their first day of work at team headquarters in Ashburn, dozens of employees said, they learned several unwritten rules: Always call the owner "Mr. Snyder" or "Sir," never "Dan." Never look him in the eyes. And if he comes walking your way, turn around and head in the other direction.

"The fear is instilled in employees from Day One," said Imbert, who worked for the team from 2008 until 2011. "The organization is led by fear."

Susan Miller, a retired former president of a Virginia employee referral agency, said she stopped sending people to work for the team in the early 2000s after growing appalled by how Snyder treated his employees.

"He denigrated people. He treated women like servants," Miller said. One time, in 2000 or 2001, Miller recalled, she got a phone call from Snyder's executive assistant informing her Snyder had fired a woman Miller had referred there because he thought she looked "frumpy" or "dowdy."

"He'd just passed her in the hall once … and then just said, 'Get rid of her,' " Miller said. The executive assistant did not respond to requests for comment.

# "He denigrated people. He treated women like servants."

— Susan Miller, a retired former president of a Virginia employee referral agency, about Daniel Snyder

Former executive assistants to Snyder described a high-pressure job with high turnover that requires two or three staffers to ensure, among many other duties, that his bar has an ample supply of Crown Royal XR and that the end of the toilet paper in his private bathroom is folded in a hotel-style point.

Those who work directly for Snyder heed a long list of protocols, according to three former executive assistants: Don't speak too loudly; never eat in front of him; don't go to the bathroom unless another assistant is available to cover the phones; don't take a lunch break, but if you must eat at your desk, make sure the food doesn't smell; clean the owner's desk each morning, ensuring that his calendar

and daily kitchen menu are in the proper locations and that his paper clips all face the same direction.



Snyder, with general manager Vinny Cerrato, in 1999, the year he bought the team. (Bill O'Leary/The Washington Post)

Female assistants said additional directives often put them in no-win situations: Wear heels but don't let your heels clack loudly. Wear smart business attire but be prepared to run down two flights of stairs and up again for ice from the kitchen in the basement, which Snyder preferred over the ice from the kitchen on the executive floor.

"When he wants something, he wanted it 10 minutes ago," a former executive assistant said. "I can't tell you how much running I did. ... I was drenched in sweat more often than

not. For ice cubes. I felt like part of my
job description apparently was
cocktail waitress in the evening."



Shannon Slate said she tried to lodge a sexual harassment complaint but was told, "This is a sports organization; men dominate it." (Jesse Dittmar for The Washington Post)

# A lack of human resources

Former employees from across Snyder's tenure, in interviews, scoffed at what they considered the team's inadequate human resources department: one full-time employee who reports to the chief financial officer. While the team's code of conduct forbids "unwelcome or unsolicited sexual advances" and conduct that "creates an intimidating, hostile or offensive working environment," dozens of women said they routinely experienced unwelcome advances.

"Things that go on there would never go on in a normal office," said Michelle Tessier, the team's public relations director from 2000 to 2004. "Being friendly was taken as an invitation to make comments. I was cornered in offices. ... There would be no one else around, and the flirting and the innuendo starts, and they take it too far."

Since 2016, the team's lone human resources staffer has reported to Choi, the chief financial officer, whose handling of two situations described by former employees deepened a

sense that the team's code of conduct regarding sexual harassment and gender equality existed only on paper.

Choi, who has worked for the team since 2009, declined an interview request through a team spokesman.

In early 2016, Shannon Slate, a 22-year-old college intern at the time, said she met with Choi to try to file a complaint against Santos, then 40.

In a phone interview, Slate described her increasing level of discomfort as Santos pursued her throughout her internship. It started with daily visits to her desk and unwanted gifts such as a team visor or a water bottle.

# "It was like fresh meat to a pack of wolves every time a new pack of interns would come in."

— Brittany Pareti, a D.C.-area marketing executive who worked in Washington's community and charitable programs from 2007 to 2012

One day after work, Slate said, Santos called her, asking about her favorite bars and whether she would date him. Santos would stop by daily and comment on her clothing, she said, including a day she wore a blue dress she considered professional and Santos told her, "That's a little too short for me not to look at."

Counseled by two female supervisors, Slate said, she went to Choi. His reaction marked an end to Slate's career in professional sports.

"He basically said: ... 'This is a sports organization; men dominate it,' " Slate recalled. " 'You have two options: Keep your distance from Alex, or you can end the internship early.' I ended the internship early."

Slate's account was supported by a college roommate she told at the time as well as by Slate's older sister.

"I guess they kind of wanted to sweep it under the rug," said Ashley Slate, a nanny in Monmouth Beach, N.J. "I wanted to call them and ask them what the hell was wrong with them."

Santos declined to comment.

Under Choi, an email sent to all employees in 2017 sparked outrage among women. The Post obtained a copy of the email.

The email, sent by Julie Kalmanides, the team's sole human resources employee, included a list of "conduct policies." Among them, Kalmanides wrote, "It has also been requested that, if at all possible, females are not present in any football areas while the players are here."

The implication, made clear in follow-up instructions by team executives, according to four women, was that they were "a distraction" to players.



All,

This is a reminder of conduct policies when in areas designated for football staff.

Downstairs:
Unless there is a legitimate business need, non-football staff are not allowed downstairs when the players are in the building. This includes giving unapproved tours, getting drinks from the soda machine, going down to practice, etc. It has also been requested that, if at all possible, females are not present in any football areas while the players are here.

Weight room:
The weight room is for full time employees only. Non-football staff hours are Monday through Friday 5:30-8:30 pm. No mornings or weekends. These hours will be revisited when the players return full time. It is imperative that staff clean up after workouts. This includes putting weights back, throwing away water bottles, putting towels in the bin, etc. Failure to adhere to these rules may result in the weight room becoming off limits to all non-football staff. As a reminder, appropriate dress is required when using the weight room. **Note: The water and Gatorade in the weight room are for coaches and players only. Please bring your own water bottle.**

Please feel free to reach out with any questions.

Thank you

**JULIE KALMANIDES**
Human Resources Coordinator | **THE WASHINGTON REDSKINS**
21300 Redskin Park Dr. Ashburn, VA | o: 703.726.7021 | f: 703.726.7172

An email from the team's one-person human resources department, with highlighting added by The Washington Post.

They said executives told female employees that, as a practical matter, men generally should perform any task that required going to the first floor at team headquarters — where the locker room, weight room, training room and team dining room are located. If women were assigned such a task but could not delegate, they were told, they could go downstairs only if accompanied by a male employee.

Kalmanides, who now works in human resources for D.C. United, Washington's Major League Soccer club, said in a statement to The Post

that the email was written by senior executives she declined to name. Kalmanides reported directly to Choi.

"At their request, I distributed the email to all staff. ... I had no involvement in the creation of this instruction," she wrote.

Women in the team's sales, marketing and sponsorship departments who might be escorting clients from the front lobby to the practice fields said the policy presented three options: Lead their guests around the side of the building and down a hill on a path used by golf carts to reach the field; direct clients to walk themselves down the staircase and out to the field while explaining that they would have to walk around the building and meet them outside; or violate the policy and escort guests down the staircase their male colleagues were allowed to access.

"We are adults in a workplace," one female former marketing employee said. "Women were professionally dressed. ... That's on the men for not being able to keep it professional."



Rachel Engleson said she reported Michael's unwelcome overtures to her direct boss, and it helped — for a time. (Nathan Morgan for The Washington Post)

# 'Big ideas' ignored

In May 2018, Snyder made a decision that, for a few months, gave many younger staffers hope the team's culture was finally about to change: He hired Brian Lafemina, then a senior vice president at the NFL, as the team's president of business operations and chief operating officer.

Lafemina, whom Snyder publicly praised for "fresh thinking and big ideas," got to work.

He publicly acknowledged that a season ticket waiting list the team once claimed included 200,000 people no longer existed. He offered discounted tickets to government employees, scouts and service members. And he pledged to "treat [fans] the way they ought to be treated."

Internally, Lafemina distributed copies of "The Five Dysfunctions of a Team" to front-office managers, hoping to spur a cultural shift based on the leadership manual's lessons on trust, commitment and accountability. When he learned how female employees had been treated, he responded swiftly.

Rachel Engleson was the messenger. A 2010 Maryland graduate, she said she endured years of sexual harassment from Michael during her ascent from unpaid intern to senior director of marketing and client services.

It started with comments about her hair and outfits, she said, and it escalated to kisses on the cheek, a suggestive email and unwelcome hugs. Nearly all of those overtures were in front of others, she said, making her humiliation worse.

Because Engleson had no faith in the team's human resources office, she said, she informed her supervisor at the time, Jason Friedman, who offered to tell Michael to leave her alone. According to Engleson, Friedman did so, and it helped for a time — until Michael, who was more than 30 years older and a senior vice president, resumed his unwelcome overtures at training camp in 2013.

In an interview with the The Post, Michael denied repeated instances of harassment and any improper touching but acknowledged making one inappropriate remark in her presence, which he declined to detail.

"There were things that were said and done in public involving Rachel that I have apologized for," Michael said.



The arrival of Brian Lafemina, right, as president of business operations and chief operating officer seemed to herald change, but Snyder fired him less than eight months into the job. (Ricky Carioti/The Washington Post) ((Photo by Ricky Carioti/The Washington Post))

Friedman did not respond to messages seeking comment.

Several years later, after Lafemina's arrival, Engleson requested a meeting with his new deputies, Steven Ziff and Jake Bye, to tell them how the team treated women.

"They needed to know what they were getting into," said Engleson, now 31. "And I needed to know, for my own future, if the place was going to change."

Engleson said she told Ziff and Bye about Michael's harassment. She also told them about the team's inadequate process for reporting harassment and

her wariness of confiding in any
executive close to Snyder.

"They were horrified," said Engleson,
who wept while recounting the
conversation. "I could not look them
in the eye. I was looking at the ground
the entire time. They both said, 'This
is not normal, and this is not okay,
and this is not what it's like anywhere
else.' "

---

Subscribe now to support journalism that
matters.

Try 1 month for $1

---

Lafemina followed up once he was
informed, according to Engleson. He
brought in a consultant from New
York to lead workplace training on
sexual harassment — the first such
training arranged by the team, she
said, during her eight-year tenure.

Lafemina and Ziff declined to
comment for this story. Bye could not
be reached to comment.

Not everyone shared Lafemina's vision for a new era. His three-year business plan, which included limiting the number of FedEx Field tickets available to opponents' fans on the resale market, predictably resulted in short-term financial declines in exchange for what he envisioned as long-term gains. But after one financial quarter showed a steep revenue drop, Snyder fired him and two of his deputies Dec. 26, 2018, after less than eight months on the job. Bye had resigned Dec. 21.

Employees were informed that afternoon in a hastily called meeting led by Terry Bateman, a former team executive whom Snyder had recently rehired. The team declined to make Bateman available for an interview.

According to Engleson and several others who attended the meeting, Bateman sought to allay concerns, explaining that the organization would be "going back to how things were."

"What do you mean, 'Back to how things were?' " Engleson recalled

asking.

Within six months, Engleson was among more than 40 employees — one-fourth of the team's non-football staff — who left the team, convinced the culture change they had been counting on would never come.

*Alice Crites contributed to this report.*

**Read more:**

How Daniel Snyder became an NFL owner 20 years ago

Who is Beth Wilkinson? Lawyer leading Washington NFL team's investigation has high-profile history.

Jerry Brewer: Daniel Snyder is detrimental to the welfare of the NFL. He must go.

The rise and fall of Larry Michael, former voice of the Washington NFL team

# EXHIBIT W8

Recently, The Washington Football Team launched an independent third-party investigation into allegations about our culture and incidents of harassment. In conversations with Commissioner Goodell, Tanya and I suggested that the NFL assume full oversight of the investigation so that the results are thorough, complete and trusted by the fans, the players, our employees and the public. I appreciate Commissioner Goodell agreeing to our suggestion and the entire Washington Football Team remains committed to fully cooperating with all aspects of the investigation.

# # #

# EXHIBIT W9



**STATEMENT FROM NFL COMMISSIONER ROGER GOODELL**

"We strongly condemn the unprofessional, disturbing and abhorrent behavior and workplace environment alleged in the report which is entirely inconsistent with our standards and has no place in the NFL.

An independent investigation into these issues is in process, led by highly experienced counsel recommended by our office.  We will continue to monitor the progress of this investigation and ensure that the club and its employees satisfy their obligation to give full cooperation to the investigators.  If at any time the club or anyone associated with the club fails to do so, the investigating counsel has been asked to promptly advise our office and we will take appropriate action. When the investigation concludes, we will review the findings and take any appropriate action at that time."

# EXHIBIT W10

**From:** Beth Wilkinson
**Sent:** Tuesday, September 29, 2020 9:53 AM
**To:**
**Subject:**

Beth

**Beth Wilkinson** | Founding Partner
**WILKINSON WALSH LLP**
2001 M Street NW, 10th Flr, Washington, DC 20036

# EXHIBIT W11

███████

**From:** Beth Wilkinson
**Sent:** Friday, October 9, 2020 10:16 AM
**To:** Dave Donovan
**Subject:** ████████████
**Attachments:** ██████████████████████████ ████████
Donovan_Draft(2071081.3).docx

Dave:

I have attached drafts of the two agreements we discussed yesterday. ████████████
█████████████████████ ████████████████████ Please review and send me
any comments you have.  Once you are comfortable with the language, I will send
██████████████████

Thanks, Beth

**Beth Wilkinson** | Founding Partner
**WILKINSON WALSH LLP**
2001 M Street NW, 10th Flr, Washington, DC 20036
██████████████████████
████████

# EXHIBIT W12



# EXHIBIT W13



SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

+1 202 736 8053
KPOPP@SIDLEY.COM

AMERICA • ASIA PACIFIC • EUROPE



**CONFIDENTIAL**

**Via Email**

Beth Wilkinson, Esq.
Wilkinson Walsh
2001 M. Street, NW
10th Floor
Washington, DC 20036
bwilkinson@wilkinsonwalsh.com

   Re: *Investigation Interview Request to David Donovan*

Ms. Wilkinson:

  I have been retained to represent Mr. David Donovan in connection with your request that he participate in an interview related to an ongoing investigation you are conducting on behalf of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

  At this time and based on the information you have provided, Mr. Donovan is not comfortable participating in such an interview for three main reasons. First, Mr. Donovan could face potential personal liability for discussing any facts, ▓▓▓▓▓▓▓▓▓ or other circumstances related to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Mr. Donovan's possession would have been gained through Mr. Donovan's role as ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓ and is thus covered by ▓▓▓▓▓▓ attorney-client privilege and by Mr. Donovan's ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Third, due to the highly sensitive and ▓▓▓▓▓▓▓▓ discussing ▓▓▓▓▓▓ could subject Mr. Donovan to potential tort law claims and related potential liability that would be costly and time-consuming to defend. I explain each one of these three reasons in greater detail below.

  First, Mr. Donovan ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships.

# SIDLEY

Beth Wilkinson, Esq.

████████████

Page 2

████████████████ While Mr. Donovan is unable to ███████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████ from discussing ████████████████
███████████████████████████████████████ the facts,
████████ underlying events giving rise to the ██████████████████████████████████.
████████████████████████████████████████████████████████████
████████████ any discussion of the matters underlying
While you have suggested ██████████████
████████████████████████████████████████████████████████ nothing you
have provided so far would qualify as a complete and satisfactory ████████ by ████
████████████████████████████████ Moreover, Mr. Donovan is not willing to ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Second, as you know, Mr. Donovan is████████████████████████████████ Thus, most
or all of the potentially relevant information in his possession is protected by the████
attorney-client privilege, and Mr. Donovan is bound by such privilege to keep that information
confidential.  Moreover, to the extent any information you seek is not covered by such privilege,
Mr. Donovan likely would still be contractually precluded from disclosing such information due
to the confidentiality obligations he owes████████ under his Employment Agreement or
otherwise.  These ethical and contractual obligations prevent Mr. Donovan from agreeing to an
interview on any matters███████████████████████████████████████████
regardless of whether such ████████ implicates ████████████████████████████
While you have suggested that███████████████████████████████████████████
████████████████████████████ would not address the concerns about Mr.
Donovan's ████████████████████████████████████████████████████
████████ and his Employment Agreement or otherwise. ████████████████ would
████████████████████████████ ethical obligations under the attorney-client
privilege and ████████████████████████████████

Third, with specific regard to ████████████████████████████████████████
████████████████████████████
████████████ would not ████████████████████████████████████
████████████████ hold him personally liable under tort law████████████████████
████████ Regardless of whether Mr. Donovan███████████████████████████████
████████████████████████ potentially arise from discussing the facts and underlying
████████████████████████ the time and expense of defending such claims
would be immense.  Given that any discussion of the facts and events underlying ████

# SIDLEY

Beth Wilkinson, Esq.
October 19, 2020
Page 3

█████████████████████████████████████████████████

████████████████████████████ is too high for Mr. Donovan to agree
to an interview.

As an additional point of note and concern, ████████████████████████

█████████████████████████████████████████. Mr. Donovan would be very
distressed to learn that your firm, in its capacity as counsel to ████████, has already spoken with
one or more other ████████████
████████████ before anyone approached Mr. Donovan ████████████████

█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████ Mr. Donovan believes that
any use and/or disclosure of such information or materials ████████████████████

█████████████████████████████████████████████████

For these reasons, Mr. Donovan will not agree to an interview at this time based on the
information you have presented to him thus far. If you believe there are facts or events you
would like to discuss with Mr. Donovan that do not relate to the ████████████
████████████████████ or otherwise implicate the concerns raised above, please let
me know and we can discuss that further.

Very truly yours,

████████████████████

Karen A. Popp

████████████████████
████████████████████
████████████████████
████████████████████

# EXHIBIT W14



2001 M STREET NW
10th Floor
WASHINGTON, DC 20036

WWW.WILKINSONWALSH.COM
—
A LIMITED LIABILITY
PARTNERSHIP

**<u>Via Email and FedEx</u>**

Karen A. Popp
Sidley Austin LLP
1501 K. Street, NW
Washington, D.C. 20005

       **Re:** Wilkinson Walsh Investigation

Dear Karen:

       I am in receipt of your ███████████ letter. I understand that Mr. Donovan does not want to cooperate with our investigation and we will report that fact and his reasons to our client, ███████ While I think it is unnecessary to address the other issues you raise, I wanted to inform you of some facts of which you may be unaware.

       Contrary to your claim that "Mr. Donovan is unable to discuss ███████████ including the facts, ███████████ and/or underlying events giving rise to ███ ███████████ During the afternoon of July 18th, your client and others discussed with me the contents of the internal investigation into allegations made ███████████. Mr. Donovan also ███████████ He also offered to provide me any additional information I might need. At that time, Mr. Donovan did not assert that he was unable to discuss the matter with me ███████████ ███████████.

       As I understand it, Mr. Donovan was ███████████ ███████████ when ███████████ The attorney-client privilege that may have governed his work is a privilege that is controlled by ███████, not him. At the outset of this investigation, the Team ███ ███████ agreed that for purposes of our independent investigation we could

speak to anyone █████████████████████████████████████████
██████████████████████████████████████████ The Team also
██████████████████████████████████████████████████████████
███████████████████.

      Finally, I see that you marked your letter to me confidential.  As we have no non-disclosure agreement with you and we do not share the attorney-client privilege, I cannot honor your request that your letter remain confidential.

                              Thank you,

# EXHIBIT W15



**SIDLEY**

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

+1 202 736 8053
KPOPP@SIDLEY.COM

AMERICA • ASIA PACIFIC • EUROPE



## CONFIDENTIAL[1]

**Via Email**

Beth Wilkinson, Esq.
Wilkinson Walsh
2001 M. Street, NW
10th Floor
Washington, DC 20036
bwilkinson@wilkinsonwalsh.com

      Re:   *Investigation Interview Request to David Donovan*

Dear Beth:

      I write to respond to your ▆▆▆▆▆▆▆▆ letter.  Your statement that Mr. Donovan does not want to cooperate with the investigation you are conducting on behalf of your client, ▆▆ ▆▆▆▆ is contrary both to what Mr. Donovan told you when you last spoke on ▆▆▆▆ and my letter to you of ▆▆▆▆▆▆  As Mr. Donovan told you, he does, in fact, wish to cooperate with your investigation, but your letter does not address the legal impediments to that cooperation that he raised when you last spoke (after you contacted him on ▆▆▆▆ for the first time since you spoke on ▆▆▆▆▆) and which are detailed in my letter of ▆▆▆▆.  Your letter does contain ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

      As an initial matter, if your representation is correct that Pro-Football, Inc, d/b/a the Washington Football Team (the "Team"), has waived the attorney-client privilege with respect to Mr. Donovan, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ or other confidentiality obligations, that is new information to Mr. Donovan.  Indeed, Mr. Donovan understood from his conversation with you ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

      In any event, if you ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[1] You indicated in your letter that you do not agree to keep these letters confidential because there is no attorney-client relationship between you and Mr. Donovan.  Given the fact that the matters discussed in these letters largely stem from conversations you had with Mr. Donovan in his position ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ while you were acting in your capacity as counsel for ▆▆▆▆  Mr. Donovan maintains that these letters should be confidential and reserves all rights in that regard.

Sidley Austin (DC) LLP is a Delaware limited liability partnership doing business as Sidley Austin LLP and practicing in affiliation with other Sidley Austin partnerships

# SIDLEY

Beth Wilkinson, Esq.

██████████████

Page 2

that you provide a copy of it.  Mr. Donovan could be subject to personal liability for potential ethical, ████████ and other breaches of his confidentiality obligations ████████████ ██████████████

     As for your discussion with Mr. Donovan on ████████ that phone call took place as part of your representation ████████ and before you represente ████████. Mr. Donovan participated in that brief phone call only in his capacity as ████████████ under the understanding that you were acting in the capacity of counsel for ████████ (which is how he recalls you were introduced on the call). ████████████████████████████

████████████████████████ as an attorney for the Team, there was no issue under either the attorney-client ████████████. However, now that you are representing ████████ and, as your letter states, seeking an interview of Mr. Donovan in your capacity as ████████ attorney, such an interview would not fall within the attorney-client privilege *or* ████████████████████ ██████████████████████████████████

████████████ with you in your capacity ████████████████████████

████████████████████████████. And, as previously stated, Mr. Donovan ████████████████████ ████████████████

     Accordingly, as my ████████ letter to you explains, it would be inappropriate for you to use or disclose information to ████████ that you learned through your representation of ████████ which is a different client, or from ████████████████ ████████████████████████████ That is especially so with respect to any information you obtained ████████████████ ████████████████ which is clearly not the case.

     Given these privilege and confidentiality concerns, along with the other personal liability concerns raised in my letter on ████████ (which Mr. Donovan says you casually dismissed when he raised them on ████████) and which your ████████ letter to me did not address at all), Mr. Donovan's position remains the same as to an interview.  His hands were and

# SIDLEY

Beth Wilkinson, Esq.

███████████████

Page 3

remain tied by his ethical and ████████████████████ both to ████████ and under the
████████████████████████ and he thus is prohibited from cooperating with your
████████ despite his desire to do so.

Very truly yours,

████████████████████

Karen A. Popp

████████████████████

# EXHIBIT W16



2001 M STREET NW
10th Floor
WASHINGTON, DC 20036

WWW.WILKINSONWALSH.COM
—
A LIMITED LIABILITY
PARTNERSHIP

███████████

***Via E-Mail***
A. Scott Bolden
Reed Smith LLP
1301 K St., N.W.
Suite 1000 – East Tower
Washington, DC 20005

███████████

███████████████████████

Dear Mr. Bolden,

I have read your ████████████ letter, 











Best Regards,



Beth Wilkinson

5